YOUNGSTOWN SHEET & TUBE CO. *v.* BOWERS,
TAX COMMISSIONER OF OHIO.

No. 9.   Argued November 12, 1958.—
Decided February 24, 1959.*

*Together with No. 44, *United States Plywood Corp.* v. *City of Algoma*, on certiorari to the Supreme Court of Wisconsin, argued November 12–13, 1958.

*Carlton S. Dargusch, Sr.* argued the cause for appellant in No. 9. With him on the brief were *Carlton S. Dargusch, Jr.* and *Jack H. Bertsch.*

*Roger C. Minahan* argued the cause and filed a brief for petitioner in No. 44.

*William Saxbe,* Attorney General of Ohio, and *John M. Tobin,* Assistant Attorney General, argued the cause and filed a brief for appellee in No. 9.

*Edwin Larkin* argued the cause and filed a brief for respondent in No. 44.

*Bruce Bromley* and *Roswell Magill* filed a brief, as *amici curiae,* in Nos. 9 and 44.

Mr. Justice Whittaker delivered the opinion of the Court.

The principal question presented by these cases is whether appellant in No. 9, the Youngstown Sheet and Tube Company, and petitioner in No. 44, United States Plywood Corporation, have so acted upon the materials which they have imported for use in their manufacturing operations as to cause them to lose their distinctive character as "imports," within the meaning of that term as used in the Import-Export Clause, Art. I, § 10, cl. 2, of the United States Constitution.[1] The Supreme Courts of the States concerned have held that these manufacturers have done so. Our task is to decide whether, on the particular facts involved, those holdings violate the Import-Export Clause of the Constitution.

The facts in the *Youngstown* case are stipulated. In essence, they are that Youngstown, an Ohio corporation, operates an industrial plant in or near Youngstown, Ohio, where it manufactures iron and steel. In addition to the use of domestic ores, it imports iron ores from five countries "for ultimate use in [its] open hearth [and] blast furnaces" in its manufacturing processes. The imported ores arrive in shiploads "in bulk" either at an Atlantic or a Lake Erie port of entry where they are unloaded from the ship into railroad cars and are thereby transported to Youngstown's plant in Ohio. The plant is enclosed by a wire fence. Within the enclosure and "adjacent to [the] manufacturing facilities" are several "ore yards" for the storage of supplies of ore.[2] Each ore yard consists

---

[1] Article I, § 10, cl. 2 of the United States Constitution, in pertinent part, provides: "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing it's inspection Laws. . . ."

[2] Exhibits in the record, though not giving measurements, indicate that the nearest ore yard is located within two or three hundred feet, and the most distant one is located within two or three hundred yards, of the furnaces.

of "two parallel walls, on which there [is] a movable ore bridge." When the imported ores arrive at this final destination, they are unloaded into one of the ore yards, but, because the ore from each country is different from the others and each is imported for a different use, the ores are kept segregated as to the country of origin by being "placed in a separate pile in a separate area of the ore yard." The daily manufacturing needs for ore are taken from these piles. As needed, ores are conveyed from the particular pile or piles selected to "stock bins" or "stock houses," holding one or two days' supply and located in close proximity to the furnaces, from which the ores are fed into the furnaces. As ore from a particular "pile" in the ore yard is thus taken and consumed, other like ore is similarly imported from the same country and is brought to the plant and unloaded on top of the remainder of that particular pile. This course is continuously repeated. Youngstown endeavors to maintain "a supply of imported ores to meet its estimated requirements for a period of at least three months." The ores are not imported "for resale," but "for use in manufacturing [at the Ohio plant]."

Acting under Ohio statutes which provide, *inter alia,* that "All personal property located and used in business in this state [shall be] subject to taxation . . ."[3] and that "Personal property is 'used' within the meaning of 'used in business' . . . when stored or kept on hand as material, parts, products, or merchandise . . . ,"[4] the Tax Commissioner of Ohio proposed to assess an ad valorem tax against Youngstown based on the average value of the iron ores in its ore yards during the tax year ended January 1, 1954.[5] Youngstown contested the proposed

---

[3] Title 57, Page's Ohio Rev. Code Ann., 1953, § 5709.01.

[4] Title 57, Page's Ohio Rev. Code Ann., 1953, § 5701.08 (A).

[5] The Ohio taxing date is January 1, Title 57, Page's Ohio Rev. Code Ann., 1953, § 5711.03. But personal property held by a

assessment. It contended, among other things, that the imported ores had not lost their character as imports and were therefore immune from state taxation under Art. I, § 10, cl. 2 of the United States Constitution.

After exhaustion of administrative proceedings, the case reached the Supreme Court of Ohio. It held that the "protection [of the Import-Export Clause cannot] extend to such iron ore (1) after it has been commingled with other iron ore imported at a different time, even though such other iron ore is of the same grade and was imported from the same place, and (2) after portions of such iron ore have been removed for use in manufacturing." It then entered judgment sustaining the tax, 166 Ohio St. 122, 140 N. E. 2d 313, and we noted probable jurisdiction of Youngstown's appeal. 355 U. S. 911.

The facts in the *United States Plywood Corporation* case were found in detail by the trial court and those findings are not challenged here. In essence, they are that United States Plywood Corporation (petitioner) operates an industrial plant in Algoma, Wisconsin, where it manufactures veneered wood products. It uses both domestic and imported lumber and veneers in its manufacturing processes. The imported lumber is shipped in railroad cars directly from Canada to petitioner's plant. It is unfinished, and is received in bulk or as loose, individual pieces or boards. It is also "green" when received and therefore must be dried before it can be used by petitioner. Upon arrival at destination, it is unloaded and carted to petitioner's storage yard, located "adjacent" to

manufacturer for use in manufacturing is valued for tax purposes "by taking the value of all [such] property . . . owned by such manufacturer on the last business day of each month [that] the manufacturer was engaged in business during the year, adding the monthly values together, and dividing the result by the number of months the manufacturer was engaged in such business during the year." Title 57, Page's Ohio Rev. Code Ann., 1953, § 5711.16.

its plant, where it is stacked in the open in such a way as to allow the air freely to circulate through the stacks for the "dominant purpose" of air-drying it. This method does not so completely dry the lumber as to make kiln-drying unnecessary, but it does materially reduce the time and expense of that process. From time to time, so much of the lumber as is about to be put into veneered products is taken from the stacks and placed in a kiln where the drying is completed and the lumber readied for use. The veneers are imported from three countries. They are received in bundles and are kept in that form in piles, separated as to specie, in petitioner's plant for use as needed in the day-to-day operations of the plant.

On the assessment date of May 1, 1955, the Assessor of the City of Algoma, acting under what is now Wis. Stat., 1957, § 70.01, assessed a tax against petitioner based upon the value of one-half of the imported lumber and veneers then on hand. Petitioner paid the tax and then sued in the state court for its recovery. The trial court also found that air-drying the lumber "was part of [petitioner's] manufacturing practices," and that, when stacked for air-drying, the lumber "entered the process of manufacture" and thus lost its character as an "import," and therefore all of it might lawfully have been taxed by the city. The court further found that the lumber and veneers had been imported by petitioner "for use in manufacturing" at its Algoma plant, and that their importation journeys definitely had ended; that the lumber and veneers that were taxed (one-half of the amounts on hand) had been irrevocably committed to "use in manufacturing" at that plant, were "necessarily required to be kept on hand to meet [petitioner's] current operational needs," were being "used in manufacturing," and had therefore lost their character as "imports" and were subject to local taxation. It then entered judgment for the city, sustaining the tax, and, on petitioner's appeal, the

Supreme Court of Wisconsin affirmed. 2 Wis. 2d 567, 87 N. W. 2d 481. Because of the importance of the constitutional question presented we granted certiorari. 356 U. S. 957.

The Constitution confers on Congress the power to lay and collect import duties, Art. I, § 8, and provides that "No State shall, without the Consent of the Congress, lay any Impost or Duties on Imports or Exports, except what may be absolutely necessary for executing it's inspection Laws. . . ." Art. I, § 10, cl. 2. That these provisions were intended to confer on the National Government the exclusive power to tax the act of importation is plain from their terms. And early in our national history Chief Justice Marshall held, in the landmark case of *Brown* v. *Maryland*, 12 Wheat. 419, that one who had imported goods for the purpose of selling them had, "by payment of the duty to the United States, [acquired the] right to dispose of his merchandise, as well as to bring it into the country" (*id.*, at 442), and that the State could not tax it "while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported." [6] *Id.*, at 442. But he made very clear that ". . . there must be a point of time when the prohibition ceases, and the power of the State to tax commences." *Id.*, at 441. Elaborating this concept, he said:

> "The constitutional prohibition on the States to lay a duty on imports . . . may certainly come in conflict with their acknowledged power to tax persons

---

[6] Chief Justice Taney, while still at the bar, had argued that case for the State of Maryland. After coming to this Court, he had occasion to say that the theory of that holding was that while the imported articles "are in the hands of the importer for sale . . . they may be regarded as merely *in transitu*, and on their way to the distant cities, villages and country for which they are destined, and where they are expected to be used and consumed, and for the supply of which they were in truth imported." *License Cases*, 5 How. 504, 575.

and property within their territory. The power, and the restriction on it, though quite distinguishable when they do not approach each other, may yet . . . approach so nearly as to perplex the understanding. . . . Yet the distinction exists, and must be marked as the cases arise. Till they do arise, it might be premature to state any rule as being universal in its application. It is sufficient for the present to say, generally, that when the importer *has so acted upon the thing imported,* that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the State. . . ." *Id.,* at 441–442. (Emphasis added.)

While Chief Justice Marshall did not undertake definitively to state just what acts or conduct of the importer would be deemed to have "so acted upon the thing imported" as to cause it to be "mixed up with the mass of property in the country [and to lose] its distinctive character as an import," he did specify some of the acts that would so result. He held that the goods lose their character as imports when the importer (1) "sells them," [7] or (2) "[breaks] up his packages, and [travels] with them as an itinerant pedlar." *Id.,* at 443. More important to the question confronting us, he also held (3) that goods brought into this country by an importer "for his own use" and here "used" by him are to be regarded as a

---

[7] The Court said that when the imported goods are sold "the tax intercepts the import, as an import, in its way to become incorporated with the general mass of property, and denies it the privilege of becoming so incorporated until it shall have contributed to the revenue of the State." 12 Wheat., at 443. That imported goods lose their character as "imports" upon being sold is well-settled. *License Cases,* 5 How. 504, 575; *Waring* v. *The Mayor,* 8 Wall. 110; *Low* v. *Austin,* 13 Wall. 29; *May* v. *New Orleans,* 178 U. S. 496.

part of "the common mass" of property and are not immune from state taxation.[8]

In *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652, it was held that goods imported for "use" share the same immunity as goods imported for "sale," and that goods imported "for manufacture [do not] lose their character as imports any sooner or more readily than imports for sale" (*id.,* at 667); but "when [the imported goods are] used for the purpose for which they are imported, they cease to be imports and their tax exemption is at an end." *Id.,* at 665.

Thus, though *Brown* v. *Maryland, supra,* holds that goods brought into the country by an importer "for his own use" are not exempted from state taxation by the Import-Export Clause, and *Hooven & Allison Co.* v. *Evatt, supra,* holds that they are, both agree that when the imported goods are "used for the purpose for which they are imported, they cease to be imports and their tax exemption is at an end." *Hooven & Allison Co.* v. *Evatt, supra,* at 665. Compare *Brown* v. *Maryland, supra,* at 441–443.

---

[8] Counsel for Maryland had argued that to permit state tax immunity in that case would result in granting immunity to "an importer who may bring in goods, as plate, for his own use, and thus retain much valuable property exempt from taxation." In reply to that argument, Marshall rejected the assumption that the principles then announced would grant state tax exemptions to imports that were being used or held for use by the importer. In such a case, as in a case where the importer "[breaks] up his packages, and [travels] with them as an itinerant pedlar," he said "[T]he tax finds the article already incorporated with the mass of property by the act of the importer. He has used the privilege [*i. e.,* of importation and sale] he had purchased, and has himself mixed them up with the common mass, and the law may treat them as it finds them. *The same observations apply to plate, or other furniture used by the importer.*" 12 Wheat., at 443. (Emphasis added.)

Do the facts as stipulated and found in the cases before us, when considered in the light of applicable legal principles, show that these manufacturers *have so acted upon the imported materials* as to cause them to lose their distinctive character as "imports" by irrevocably committing them, after their importation journeys have definitely ended, to "use in manufacturing" at the plant and point of final destination, and by "entering" and "using" them "in manufacturing" at that place? The manufacturers, relying upon their understanding of the *Hooven* case, argue that they do not, but we have concluded that they do.

In *Hooven* the taxpayer had imported bales of hemp and other fibers which it stored in its warehouse at its factory in Ohio with the intention of eventually using them in the manufacture of cordage and similar products. Ohio sought to lay an ad valorem tax on the bales of fibers so stored in the taxpayer's warehouse. The taxpayer contended that the bales of fibers were "imports" and thus immune from state taxation under the Import-Export Clause of the Constitution. The Supreme Court of Ohio "thought that *Brown* v. *Maryland, supra,* laid down a rule applicable only to imports for the purpose of sale, and that imports for use became, upon storage, even if still in the original package, so intermingled with the common mass of property within the State as to be subject to the State power of taxation" (324 U. S., at 655), and upon that ground upheld the tax. This Court, holding that the tax immunity applies to goods imported for "use" as well as for "sale," that the bales of fibers would not lose their character as imports "until [they were] put to the use for which [they were] imported" (*id.,* at 665), and that the fibers were not shown by the record in that case to have been "subjected to manufacture

when they were placed in [the taxpayer's] warehouse in their original packages" (*id.,* at 667), reversed the judgment. But the record there did not present, and this Court did not reach or decide, the question we have here. Indeed, the Court expressly reserved it. It said:

> "[I]t is unnecessary to decide whether, for purposes of the constitutional immunity, the presence of some fibers in the factory was so essential to current manufacturing requirements that they could be said to have entered the process of manufacture, and hence were already put to the use for which they were imported, before they were removed from the original packages. Even though the inventory of raw material required to be kept on hand to meet the current operational needs of a manufacturing business could be thought to have then entered the manufacturing process, the decision of the Ohio Supreme Court did not rest on that ground, and the record affords no basis for saying that any part of petitioner's fibers, stored in its warehouse, were required to meet such immediate current needs. Hence we have no occasion to consider that question." *Id.,* at 667.

Unlike *Hooven,* these are not cases of the mere storage in a warehouse of imported materials intended for eventual use in manufacturing but not found to have been essential to current operational needs. Here the Ohio and Wisconsin courts have in effect held that the stipulated and found facts show that the imported materials that were taxed by those States were so essential to current manufacturing requirements that they must be said to have entered the process of manufacture, and those courts have rested their judgments, in major part at least, on that ground. Our question therefore is precisely the one which the Court did not reach or consider in the *Hooven* case.

We are therefore confronted with the practical, albeit vexing, problem of reconciling the competing demands of the constitutional immunity of imports and of the State's power to tax property within its borders. The design of the constitutional immunity was to prevent "[t]he great importing States [from laying] a tax on the non-importing States," to which the imported property is or might ultimately be destined, which would not only discriminate against them but also "would necessarily produce countervailing measures on the part of those States whose situation was less favourable to importation." *Brown* v. *Maryland, supra,* at 440. See Madison, Debates in the Federal Convention of 1787, August 28, 1787 (Hunt & Scott ed.). And see, *e. g., Cook* v. *Pennsylvania,* 97 U. S. 566, 574; *Richfield Oil Corp.* v. *State Board,* 329 U. S. 69, 76–77. The constitutional design was then to immunize imports from taxation by the importing States, and all others through or into which they may pass, so long as they retain their distinctive character as imports. Hence, that design is not impinged by the taxation of materials that were imported for use in manufacturing after all phases of the importation definitely have ended and the materials have been "put to the use for which they [were] imported" (*Hooven & Allison Co.* v. *Evatt, supra,* at 657), for in such a case they have lost their distinctive character as imports and are subject to taxation. And inasmuch as "the reconciliation of the competing demands of the constitutional immunity and of the state's power to tax, is an extremely practical matter" (*Hooven & Allison Co.* v. *Evatt, supra,* at 668), we must approach the question whether these materials had been "put to the use for which they [were] imported" (*id.,* at 657) with full awareness of realities and treat with them in a practical way.

The stipulation in the *Youngstown* case shows that the imported ores were essential to the operation of Youngs-

town's Ohio plant; that Youngstown had imported them "for use in manufacturing" and "to meet its estimated [manufacturing] requirements" at that plant; that the ores had arrived at their destination, had been placed in "piles" in the "ore yards" of that plant, and their importation journey definitely had ended; that the ores were irrevocably committed to "use in manufacturing" at that plant and point of final destination; and that the daily ore needs of the plant were conveyed from the "piles" in the "ore yards" to "stock bins" or "stock houses," holding one or two days' supply, from which they were fed into the furnaces. Does not the stipulation thus show that the ores were not only needed, imported, and irrevocably committed to supply, but were actually being used to supply, the daily requirements of the plant? It seems to us that these stipulated facts inescapably establish that Youngstown had "so acted upon the [imported ores]" (*Brown* v. *Maryland, supra,* at 441), by using them "for the purpose for which they [were] imported," that they must be held "to have then entered the manufacturing process" (*Hooven & Allison Co.* v. *Evatt, supra,* at 665, 667) and to have lost their distinctive character as "imports" and all tax immunity as such.

Youngstown does not deny that so much of the ores as have been conveyed from the "piles" in the "ore yards" to the "stock bins" or "stock houses" have lost their distinctive character as imports. Is there any real basis of distinction? The only possible differences are in the sizes of the piles and their distances from the furnaces. Surely the size of the pile is not material. Just as surely the short distance between the smaller piles in the "stock bins" or "stock houses" and the larger piles in the ore yards is not a real distinction. If the larger piles stood on higher ground adjoining the "stock bins" and "stock houses" so that the ores might feed by gravity from the

former to the latter there would be no practical difference from the actual facts involved, but it could not be argued that the ores in the one are any less certainly being used in the processes of manufacture than the ores in the other. It seems entirely plain that the ores in the smaller piles in the "stock bins" and "stock houses" are no more definitely and irrevocably committed to use, or being used, at the plant than are the ores in the larger piles in the ore yards from which the smaller ones are constantly kept supplied. "[R]econciliation of the competing demands of the constitutional immunity and of the state's power to tax [being] an extremely practical matter" (*Hooven & Allison Co.* v. *Evatt, supra,* at 668), taxability cannot depend upon whether the size of the pile of stored materials or its distance from the place of actual fabrication or consumption is a little more or a little less.

In the *United States Plywood Corporation* case, two types of imported materials are involved—unfinished "green" lumber received "in bulk" and veneers received in "bundles." The Assessor of the City of Algoma, believing that one-half of the lumber and veneers on hand on the taxing date was necessarily required to be kept on hand to meet the current operating needs of petitioner's manufacturing plant, assessed an ad valorem tax upon the value of that one-half of the lumber and veneers. In the ensuing litigation, the Wisconsin courts found that the imported materials had been imported by petitioner "for use in manufacturing" at its Algoma plant, had arrived at that place and that their importation journeys definitely had ended; that the lumber and veneers that were taxed (one-half of the amounts on hand on the taxing date) had been irrevocably committed to "use in manufacturing" at that plant, were "necessarily required to be kept on hand to meet [its] current operational needs," and were actually being "used" to supply those

needs. These findings are amply supported by the evidence and are not contested here. We think they clearly show that the lumber and veneers that were taxed were not only needed, imported, and irrevocably committed to supply, but were actually being used to supply, the day-to-day manufacturing requirements of the plant. They thus establish that petitioner had "so acted upon the [imported materials]" (*Brown* v. *Maryland, supra,* at 441) that were taxed by using them "for the purpose for which they [were] imported," that—like the ores in the *Youngstown* case—they must be held "to have then entered the manufacturing process" (*Hooven & Allison Co.* v. *Evatt, supra,* at 665, 667) and to have lost their distinctive character as "imports" and all tax immunity as such.

The fact that the veneers were received in "bundles" which were not opened until the veneers were put into the daily manufacturing operations of the plant is not controlling under the facts and findings here. Whatever may be the significance of retaining in the "original package" goods that have been so imported for sale (*Brown* v. *Maryland, supra; Waring* v. *The Mayor,* 8 Wall. 110, 122–123; *Low* v. *Austin,* 13 Wall. 29, 32–33; *Cook* v. *Pennsylvania,* 97 U. S. 566, 573; *May* v. *New Orleans,* 178 U. S. 496, 501, 507–508), goods that have been so imported for use in manufacturing are not exempt from taxation, though not removed from the "original package," if, as found here, they have been "put to the use for which they [were] imported." *Hooven & Allison Co.* v. *Evatt, supra,* at 657. Breaking the original package is only one of the ways by which packaged goods that have been imported for use in manufacturing may lose their distinctive character as imports. Another way is by putting them "to the use for which they [were] imported." *Id.* That the package has not been broken is, there-

fore, only one of the several factors to be considered in factually determining whether the goods are being "used for the purpose for which they [were] imported." *Hooven & Allison Co.* v. *Evatt, supra,* at 665. Here the fact that the bundles are not opened until the veneers are put into the day-to-day manufacturing operations of the plant was fully considered by the Wisconsin courts before they made the finding that the veneers that were taxed were "necessarily required to be kept on hand to meet [petitioner's] current operational needs," and were actually being "used" to supply those needs.

Because of the views expressed, it is unnecessary to reach or discuss the further finding and conclusion of the Wisconsin courts that when the "green" lumber was stacked by petitioner in the open in a particular way for the "dominant purpose" of air-drying it, the lumber "entered the process of manufacture," and, for that reason also, lost its character as an import.

The materials here in question were imported to supply, and were essential to supply, the manufacturer's current operating needs. When, after all phases of their importation had ended, they were put to that use and indiscriminate portions of the whole were actually being used to supply daily operating needs, they stood in the same relation to the State as like piles of domestic materials at the same place that were kept for use and used in the same way. The one was then as fully subject to taxation as the other. In those circumstances, the tax was not on "imports," nor was it a tax on the materials because they had been imported, but because at the time of the assessment they were being used, in every practical sense, for the purposes for which they had been imported. They were therefore subject to taxation just like domestic property that was kept at the same place in the same way

for the same use. We cannot impute to the Framers of the Constitution a purpose to make such a discrimination in favor of materials imported from other countries as would result if we approved the views pressed upon us by the manufacturers. Compare *May* v. *New Orleans*, 178 U. S., at 509.

Youngstown also challenged a portion of the tax on the ground that its domestic ores stored on public docks on the shore of Lake Erie in Ohio were "merchandise . . . held in a storage warehouse for storage only" within the meaning of § 5701.08 (A),[9] and that, because the section exempted nonresidents but taxed residents on stocks of merchandise so held, it denied to Youngstown, a resident of Ohio, the equal protection of the laws in violation of the Fourteenth Amendment of the Constitution. The Supreme Court of Ohio answered that contention by saying: "For the reasons stated in *Allied Stores of Ohio, Inc.*, v. *Bowers, Tax Commr., ante* [166 Ohio St.], 116, the taxpayer's contentions [in that respect] must be rejected . . . ." *Youngstown Sheet & Tube Co.* v. *Bowers*, 166 Ohio St. 122, 124, 140 N. E. 2d 313, 316. We have today affirmed the judgment of the Supreme Court of Ohio in *Allied Stores of Ohio, Inc.*, v. *Bowers, Tax Comm'r, ante*, p. 522, and for the reasons stated in our

---

[9] As earlier stated (Note 3), § 5709.01 provides in pertinent part, "All personal property located and used in business in this state [shall be] subject to taxation . . . ." (Title 57, Page's Ohio Rev. Code Ann., 1953, § 5709.01), and § 5701.08 (A), at the time in question, provided, in pertinent part, that:

"As used in Title LVII of the Revised Code:

"(A) Personal property is 'used' within the meaning of 'used in business' . . . when stored or kept on hand as material, parts, products, or merchandise; but merchandise or agricultural products belonging to a nonresident of this state is not used in business in this state if held in a storage warehouse for storage only. . . ." Title 57, Page's Ohio Rev. Code Ann., 1953, § 5701.08 (A).

opinion in that case we hold that § 5701.08 (A) and the questioned tax laid thereunder did not violate the Equal Protection Clause of the Fourteenth Amendment.

It follows that the judgment in each case must be

*Affirmed.*

MR. JUSTICE STEWART took no part in the consideration or decision of these cases.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE HARLAN joins, dissenting on the main issue.

As one follows the tortuous and anguished endeavors to establish a free trade area within Western Europe, unhampered by interior barriers, against the opposition of inert and narrow conceptions of self-interest by the component nations, admiration for the far-sighted statecraft of the Framers of the Constitution is intensified. Guided by the experience of the evils generated by the parochialism of the new States, the wise men at the Philadelphia Convention took measures to make of the expansive United States a free trade area and to withdraw from the States the selfish exercise of power over foreign trade, both import and export. They accomplished this by two provisions in the Constitution: the Commerce Clause and the Import-Export Clause.

The former reached its aim, as a matter of settled judicial construction, by placing the regulation of commerce among the States in the hands of Congress, except insofar as predominantly local interests give the States concurrent power until displaced by congressional legislation. This leeway to the States was established by the decision in *Cooley* v. *Board of Wardens,* 12 How. 299, foreshadowed by Marshall's decision in *Willson* v. *Black Bird Creek Marsh Co.,* 2 Pet. 245. This permissive area for state action has given rise, as we know too well, to multitudinous litigation.

552

But in dealing with foreign commerce the Constitution left no such leeway. It rigorously confined the States to what might be "absolutely necessary," the only constitutional permission in terms so drastically limited, and beyond this permission of what is "absolutely necessary" state action was barred except by consent of Congress as expressive of the national interest. Thus, hardly any room was left by the Constitution for judicial construction of the command, "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws . . . ." This strict limitation on the States was still further qualified by the requirement that the "net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Controul of the Congress."

For one hundred and thirty-two years, in a course of decision following Chief Justice Marshall's seminal discussion in *Brown* v. *Maryland,* 12 Wheat. 419, this Court has held, without a single deviation, that a State may not tax imports from foreign countries while retained by the importer in their original "package" [1] or form prior to the use of the goods or their sale. Today the Court, I am

---

[1] Although the principles of *Brown* v. *Maryland* are often termed the "original package doctrine," Marshall was concerned with a "package" only because the statute in that case taxed the selling of goods in their original packages. 12 Wheat., at 436 & 443. Marshall himself is careful to use the phrase, "form or package," 12 Wheat., at 442, and Mr. Chief Justice Taney, in his reformulation of *Brown* v. *Maryland,* used the characterization "form and shape." See p. 560, *infra.* "It is a matter of hornbook knowledge that the original package statement of Justice Marshall was an illustration, rather than a formula, and that its application is evidentiary, and not substantive, . . . ." *City of Galveston* v. *Mexican Petroleum Corp.,* 15 F. 2d 208.

bound most respectfully to say, disregards this historic course of constitutional adjudication by allowing the States of Wisconsin and Ohio, and, therefore, all the States, to tax foreign imports despite the prohibition of Art. I, § 10, cl. 2, that "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, . . ." as that clause has been authoritatively interpreted by this Court. And it does so, moreover, without overruling the decisions which the basis and logic of this new reading of the Constitution can no longer sustain. But they remain decisions of this Court. Thus, we are left with a confusing series of conflicting cases amidst which the States must blindly move in determining the extent of their constitutional power to tax. This confusion is substituted for a principle so plain of application that the controversies in this Court over the meaning of this far-reaching constitutional provision have numbered less than a dozen in our entire history. Of course, I do not believe that we should overrule this consistent course of decisions. But to do so would at least have the merit of explicit announcement of a new legal policy, with its concomitant repercussions on the conduct of our national economic life.

Since the legal analysis of the challenged taxes must derive from due regard for the precise circumstances on which they are based, it becomes necessary to set forth the facts of the two cases now before us.

In No. 44, *United States Plywood Corp.* v. *City of Algoma,* petitioner, a New York corporation licensed to do business in Wisconsin, attacks the validity of a tax levied by the City of Algoma on its storage stock of imported lumber and veneers. The veneers are imported from Canada, France and the Belgian Congo. From Canada comes birch veneer, from France, French oak veneer, and from Africa, species of veneer known as korina and fuma. The veneers are shipped to petitioner

in wooden crates or in bundles secured by metal straps. After arrival at petitioner's plant the veneers are stored in a warehouse in their original packages prior to their use in the manufacture of veneered products. When used the packages are broken and take their course through the factory. The lumber, birch and cedar, is imported from Ontario, Canada. When received it is piled in the yard preparatory to use in manufacture.

The City of Algoma assessed for taxation one-half of the total value of the imported lumber piled in the yard and the veneers stored in their original packages in the warehouse, on tax day—May 1, 1955. The city said that at least that amount of the imported materials was necessary to meet the "current operational requirements" of petitioner and thus was subject to state taxation.

The State Supreme Court upheld the tax on the basis of the finding below that the goods taxed were necessary for the "current operational needs" of the plant. The tax on the lumber was sustained on an alternative ground. Since the dominant purpose of piling the lumber in the storage yard was to prepare it for manufacture by air drying, the lumber had entered the process of manufacture and lost its immunity from state taxation. Most of the Canadian lumber was received green and, as a matter of good business practice, it is customary to air dry such lumber before running it through dry kilns to further remove moisture.

In No. 9, *Youngstown Sheet & Tube Co.* v. *Bowers,* appellant challenges the application of a personal property tax to its stocks of imported iron ore stored at its plant in Youngstown, Ohio. The facts were stipulated. Appellant purchases and imports five grades of iron ore: Brazilian ore, Cuban ore, Mexican ore, Liberian ore, and Seine River ore. These ores are loaded in bulk at foreign ports into chartered vessels, each of which carries but a single cargo of a single grade of ore. When

the vessels reach the port of entry, the ore is discharged into railroad cars and transported in bulk to appellant's plant in Youngstown. Upon arrival the ore is unloaded into a storage yard adjacent to the manufacturing plant. A separate storage pile in a separate area of the storage yard is maintained for each grade of imported ore, and such ore is not commingled with any other property. A supply of ore necessary to meet estimated requirements for at least three months is maintained. Since the ore is located at some distance from stock bins and furnaces, when the need arises for a particular grade of ore it is taken from the grade stock pile and transported to stock bins or stock houses preparatory to use in the furnaces. When a shipment of bulk ore of a particular grade is received it is placed in the stock pile designated for that grade, i. e., all imports of Brazilian ore are placed in the Brazilian pile, etc. Hence a stock pile of a particular grade may be diminished by a particular day's need, and augmented the next by subsequently imported ore of the same grade.

Appellant conceded that the imported ores had lost their immunity from taxation once they were removed from storage piles and placed in stock bins. The Supreme Court of Ohio decided that all the imported ore, including that remaining in the storage piles, could be taxed by the State, and upheld the challenged assessment. The Ohio court thought that the mere mingling of imported ore with other imported ore of the same grade, coupled with the fact that parts of each pile were taken for use in manufacturing, had terminated the constitutional immunity and subjected the entire stock of imported ore to state taxation.

Primary among the forces which led to the inclusion of Art. I, § 10, cl. 2, the Import-Export Clause, in the Constitution, was the deeply felt necessity of vesting exclusive power over foreign economic relations and foreign

commerce in the new National Government.[2]  The importance of control over duties, imposts, and subsidies as an instrument of foreign trade and as a protection for the encouragement and growth of domestic manufactures was recognized as a matter of course by the Framers. For the effective exercise of this control it was necessary that the Government speak with one voice when regulating commercial intercourse with foreign nations.  Orderly and effective policy would be impossible if thirteen States, each with their distinctive interests, and often conflicting, one with another, were allowed to exercise their own initiative in the regulation of foreign economic affairs. And so the States were prohibited from such regulation— they were forbidden, except by leave of Congress, to lay any duties on imports or on exports.  Second only to this goal in importance, was the need to secure to the National Government an important source of revenue.[3]  The Framers assumed that, for many years, duties on foreign imports would be the prime source of national funds; the revenue on whose constant flow the operations of government would depend.  It therefore was essential to the fiscal well-being of the new country to ensure exclusive access to this revenue to the National Government. Subordinate to these goals in importance was the desire to prevent the seaboard States, possessed of important ports of entry, from levying taxes on goods flowing through their ports to inland States.[4]  It was important not to allow these States to take advantage of their favorable geographical position in order to exact a price for the use of their ports from the consumers dwelling in

[2] See Letter of James Madison to Professor Davis, 3 Farrand, Records of the Federal Convention (1911), 520–521; Federalist No. 12 (Lodge ed. 1908) 67 (Hamilton); *ibid.*, No. 44, at 280 (Madison).

[3] See Federalist No. 12 (Lodge ed. 1908) 67 (Hamilton).

[4] See 2 Farrand, Records of the Federal Convention (1911), 441–442.

less advantageously situated parts of the country. This fear of the use of geographical position to exact a form of tribute found an especially forceful expression in the absolute prohibition against duties on exports by either Nation or States.

The Import Clause was a result of the desire to safeguard these national goals and realize these necessities. Thus, the considerations governing its interpretation marked out for it a special path in the stream of constitutional adjudication—a course which diverged in many respects from the history of the Commerce Clause: that broad grant of power designed primarily to assure national control over commercial trade among the States. The often difficult, and continually delicate, considerations of the economic impact of a challenged tax, of the directness of its burden upon commerce, of its potential or actual discrimination against interstate trade, which have been of controlling importance to the proper evaluation of state taxes challenged under the Commerce Clause, are not the pertinent factors in assessing the constitutional validity of a tax charged with being in violation of the bar of Art. I, § 10, cl. 2. In the taxation of imports, the grant of power to the National Government is exclusive; the prohibition of the States, absolute.[5] Thus the

---

[5] In *Richfield Oil Corp.* v. *State Board of Equalization*, 329 U. S. 69, at 75–76, we pointed out that

". . . the law under the Commerce Clause has been fashioned by the Court in an effort 'to reconcile competing constitutional demands, that commerce between the states shall not be unduly impeded by state action, and that the power to lay taxes for the support of state government shall not be unduly curtailed.' That accommodation has been made by upholding taxes designed to make interstate commerce bear a fair share of the cost of the local government from which it receives benefits . . . and by invalidating those which discriminate against interstate commerce, which impose a levy for the privilege of doing it, which place an undue burden on it. . . .

"It seems clear that we cannot write any such qualifications into

objects of relevant inquiry have been carefully circum-
scribed. Once it is clear, as a matter of economic fact,
that a State has levied a tax upon foreign goods, this Court
has always found it necessary to answer only one further
question. The question was put by Chief Justice Mar-
shall in 1827 in *Brown* v. *Maryland:* Have the goods
retained their status as imports in the hands of the
importer? If so, the tax is invalid. If not, if the goods
have become part of the general property of the State, the
tax is not barred by the Import Clause. The answer to
this question involves essentially a determination of the
physical status of the foreign goods. But, however var-
iant the facts in different situations, the determinative
principles have remained constant. And in the cases now
before us, just as in every case this Court has decided
under the Import Clause, the rules of decision must flow
from the careful and authoritative exposition of Chief
Justice Marshall in the governing case of *Brown* v. *Mary-
land*. The Chief Justice recognized that at some point in
the importing process foreign goods lose their immunity
and become subject to the taxing power of the State. Yet
the goods must remain immune from state levies long
enough to give the constitutional prohibition its intended
effect. Every case decided under the Import Clause, from
that day to this, has been concerned with applying to the
particular facts before the Court the considerations and
standards formulated in *Brown* v. *Maryland* for determin-

---

the Import-Export Clause. It prohibits every State from laying 'any'
tax on imports or exports without the consent of Congress. . . . It
would entail a substantial revision of the Import-Export Clause to
substitute for the prohibition against 'any' tax a prohibition against
'any discriminatory' tax. . . . the two clauses, though complemen-
tary, serve different ends. And the limitations of one cannot be read
into the other."

See also *Woodruff* v. *Parham,* 8 Wall. 123; *Sonneborn Bros.* v.
*Cureton,* 262 U. S. 506; Federalist No. 32 (Lodge ed. 1908) 186–188
(Hamilton).

ing when the exclusive national power ends and state power begins.[6] In words grown familiar with judicial statement, yet deserving of repetition here, the great Chief Justice stated both the problem and the guide for decision. "[T]here must be a point of time," Marshall postulated, "when the prohibition ceases, and the power of the State to tax commences; . . . It is sufficient for the present to say, generally, that when the importer has so acted upon the thing imported, that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the State; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the constitution." 12 Wheat., at 441–442.

Since, in *Brown* v. *Maryland,* the object of importation had been sale, reasoned the Chief Justice, certainly the importer was entitled to realize that aim without being subject to state taxation. Although more subtle, more befogging cases might be imagined, it was "plain" that, at least while in the hands of the importer in its original form or package, the foreign good remained an import and thus free from state levies.

The counsel for the State of Maryland in *Brown* v. *Maryland* was its Attorney General, Roger B. Taney.

---

[6] *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652; *Anglo-Chilean Corp.* v. *Alabama,* 288 U. S. 218; *Gulf Fisheries Co.* v. *MacInerney,* 276 U. S. 124; *New York ex rel. Burke* v. *Wells,* 208 U. S. 14; *May* v. *New Orleans,* 178 U. S. 496; *Low* v. *Austin,* 13 Wall. 29; *Waring* v. *The Mayor,* 8 Wall. 110. See also *McGoldrick* v. *Gulf Oil Corp.,* 309 U. S. 414; *Cook* v. *Pennsylvania,* 97 U. S. 566. For additional statements of the authority and importance of the doctrine of *Brown* v. *Maryland,* see *American Steel & Wire Co.* v. *Speed,* 192 U. S. 500, 519–520; *Norfolk & Western R. Co.* v. *Sims,* 191 U. S. 441, 449; *The License Cases,* 5 How. 504, 575.

Twenty years later, sitting as Chief Justice, Taney acknowledged that "further and more mature reflection" had made clear to him the wisdom of the principles laid down by his predecessor. "Indeed," said Mr. Chief Justice Taney, "goods imported, while they remain in the hands of the importer, in the form and shape in which they were brought into the country, can in no just sense be regarded as a part of that mass of property in the State usually taxed for the support of the State government." [7]

It is needless to review the consistency with which this Court has repeated and applied the formulas of Marshall and Taney. A few of the more important examples will serve as concrete illustrations. In *Low* v. *Austin*, 13 Wall. 29, the Supreme Court of the State of California had sustained the application of a general ad valorem property tax to cases of imported French champagne which were being held in the warehouse of the importer, a commission merchant, for purposes of sale. The California court was unable to discern any "reason why imported goods, exposed in the store of a merchant for sale, do not constitute a portion of the wealth of the state as much as do domestic goods similarly situated." [8] This Court rejected the reasoning of the state court as in conflict with the principles of *Brown* v. *Maryland,* and invalidated the application of the tax to the imported wine. "[G]oods imported," said this Court, "do not lose their character as imports, and become incorporated into the mass of property of the State, until they have passed from the control of the importer or been broken up by him from their original cases. Whilst retaining their character as imports, a tax upon them, in any shape, is within the constitutional prohibition." [9] Similarly, in *Anglo-Chilean Corp.* v. *Ala-*

---

[7] *The License Cases,* 5 How. 504, 575.

[8] 1 Calif. Unreported Cases 638, 643. The passage is also quoted at 13 Wall. 30–31.

[9] 13 Wall., at 34.

*bama,* 288 U. S. 218, bags of Chilean nitrate stored in the importer's warehouse, awaiting sale, were held to be immune from assessment under the general franchise tax of the State of Alabama. The consistency with which these principles have been applied is demonstrated even more lucidly in those instances in which the Court has upheld a tax on goods held by the importer. In each such case the tax has been allowed only after an indubitable demonstration that the goods involved had been so altered from the physical form in which they had arrived upon importation that they had lost their character as foreign imports and had become, through the importer's action, a new ingredient of the general mass of property of the State.[10]

The historic standards governing the application of the Import Clause received recent reaffirmation in *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652. That case is of compelling significance here. For the situation there involved so precisely parallels the circumstances now before us as to control these cases, unless *Hooven & Allison* is to be overruled and the dissenting views expressed in that case adopted as the Court's views.

The Hooven & Allison Company imported bales of foreign hemp for use in the manufacture of cordage and similar products. The State of Ohio sought to tax this hemp while it was stored in the manufacturer's warehouse subsequent to importation, and prior to use. During hearings before the Ohio Board of Tax Appeals it was established that the company was accustomed to keep on hand merely a "minimum working inventory" of imported hemp, an amount sufficient to compensate for the three- to six-month delay involved in shipping the hemp from foreign countries. On appeal, the Ohio Supreme Court

---

[10] *New York ex rel. Burke* v. *Wells,* 208 U. S. 14; *Gulf Fisheries Co.* v. *MacInerney,* 276 U. S. 124; *May* v. *New Orleans,* 178 U. S. 496. Cf. *Waring* v. *The Mayor,* 8 Wall. 110.

sustained the tax on the grounds that the hemp, having been stored for the purposes of manufacture, had lost its constitutional immunity. In support of its conclusion the Ohio court quoted the portion of the proceedings below in which the company had admitted the presence of only a "minimum working inventory." This fact was urged before this Court in support of the State's request for affirmance.[11]

This Court invalidated the tax and reversed the judgment of the Ohio Supreme Court. Mr. Chief Justice Stone thus spoke for the Court:

> "Although one Justice dissented in *Brown* v. *Maryland, supra,* from that day to this, this Court has held, without a dissenting voice, that things imported are imports entitled to the immunity conferred by the Constitution; that that immunity survives their arrival in this country and continues until they are sold, removed from the original package, or put to the use for which they are imported." 324 U. S., at 657.

> . . . . .

> ". . . no opinion of this Court has ever said or intimated that imports held by the importer in the original package and before they were subjected to the manufacture for which they were imported, are liable to state taxation. On the contrary, Chief Justice Taney, in affirming the doctrine of *Brown* v. *Maryland,* in which he appeared as counsel for the State, declared, as we now affirm: 'Indeed, goods imported, while they remain in the hands of the importer, in the form and shape in which they were brought into the country, can in no just

---

[11] The record and proceedings below in *Hooven & Allison* are discussed in detail at notes 13 and 14, *infra.*

sense be regarded as a part of that mass of property in the state usually taxed for the support of state government.' . . .

". . . We do not perceive upon what grounds it can be thought that imports for manufacture lose their character as imports any sooner or more readily than imports for sale. The constitutional necessity that the immunity, if it is to be preserved at all, survive the landing of the merchandise in the United States and continue until a point is reached, capable of practical determination, when it can fairly be said that it has become a part of the mass of taxable property within a state, is the same in both cases." 324 U. S., at 666–667.

Indeed there is no process of logic, however dextrous, which would strike down a tax on imported goods being held prior to sale and allow a tax on goods stored prior to the processing which is preliminary to sale. In fact, the latter tax is less essential to state revenue since, in the case of goods held for manufacture, the State still retains the opportunity to impose a tax on the first sale. If the merchant who imported goods for the purpose of sale was entitled to realize that purpose before being subject to state taxes, certainly the manufacturer who had imported goods in order to process them was entitled to no lesser privilege. Goods lying in a manufacturer's warehouse in their original form or container are no more a part of the general mass of property of a State than are goods which are displayed by a commission merchant, in their original crates, for purposes of sale; nor is a tax on goods stored for manufacture any less of an "interception" of those goods while they are still imports than is a tax on goods immediately prior to their first sale. Clearly *Hooven & Allison* did not represent an extension of the principles of *Brown* v. *Maryland* but was an application of that deci-

sion in a context where to distinguish the principle would have been to reject it.[12]

The lucid standards developed by this Court for the interpretation of the Import Clause give clear guidance

---

[12] The opinion of the Court asserts that the decision in *Hooven & Allison* is inconsistent with the reasoning of Marshall in *Brown* v. *Maryland*. We are told that *Brown* v. *Maryland* "holds that goods brought into the country by an importer 'for his own use' are not exempted from state taxation . . . and *Hooven & Allison Co.* v. *Evatt*, . . . holds that they are. . . ." Surely this expresses a misapprehension of what Marshall said. Such a contention was made here, by the dissent in *Hooven & Allison Co.* v. *Evatt*, 324 U. S. 652, at 686–688 (dissenting opinion), and silently rejected. For its refutation see Professor Thomas Reed Powell's State Taxation of Imports—When Does an Import Cease to be an Import, 58 Harv. L. Rev. 858, 859–864.

The statement of Marshall which is the basis of what is attributed to him was made by the Chief Justice in response to a contention by the State of Maryland that to grant immunity in this case would mean that an importer "may bring in goods, as plate, for his own use, and thus retain much valuable property exempt from taxation." 12 Wheat., at 442–443. .Marshall thus dealt with this and similar contentions:

"This indictment is against the importer, for selling a package of dry goods in the form in which it was imported, without a license. This state of things is changed if he sells them, or otherwise mixes them with the general property of the State, by breaking up his packages, and travelling with them as an itinerant pedlar. In the first case, the tax intercepts the import, as an import, in its way to become incorporated with the general mass of property, and denies it the privilege of becoming so incorporated until it shall have contributed to the revenue of the State. It denies to the importer the right of using the privilege which he has purchased from the United States, until he shall have also purchased it from the State. In the last cases, the tax finds the article already incorporated with the mass of property by the act of the importer. He has used the privilege he had purchased, and has himself mixed them up with the common mass, and the law may treat them as it finds them. The same observations apply to plate, or other furniture used by the importer." 12 Wheat., at 443.

It is clear that Marshall is referring to personal household goods

for the disposition of the present cases.  We accept the finding of the Wisconsin courts that the imported lumber was stored for the dominant purpose of air drying.  Having entered the process of manufacture, the goods had become subject to the taxing power of the State.  However, neither the imported ores in No. 9 nor the foreign veneers in No. 44 had been subject to manufacturing.  On tax day they lay in the manufacturer's storage area, in their original "form and shape," awaiting their initial processing.  Thus the taxes sought to be levied on these materials are clearly barred by the historic series of adjudications of this Court, which have established that goods so situated, whether awaiting sale or manufacture, are constitutionally immune from state taxation under the proscription of Art. I, § 10, cl. 2, of the Constitution.

Yet the Court does not choose to take this plainly marked path of constitutional decision.  Rather it has

---

brought in by the importer and used by him.  He is rejecting the idea that immunity can continue indefinitely after use if there has been no sale.  He does not say, as the Court would have him say, that goods brought in by an importer "for his own use," or goods "held for use," are subject to state taxation.  The phrase "for his own use," which the Court places in quotation marks and attributes to Marshall, was the Chief Justice's statement of counsel's contention and is not to be found in his own conclusion.  The phrase "held for use," which the Court also attributes to Marshall in its paraphrase of his views, is an interpolation nowhere to be found in the Chief Justice's discussion.  Goods which are imported for purposes of sale are brought in for "use" as much as are goods which have been brought in for manufacture.  A tax imposed prior to processing "intercepts" goods on their way to incorporation in the general mass of property as effectively as does a tax prior to sale.  Marshall was not distinguishing between goods brought in for manufacture and those brought in for sale.  There is no rational distinction.  He was merely denying immunity to goods which had been brought in and thereafter actively used by the importer.  There is nothing in *Brown* v. *Maryland* that is not in complete accord with what was decided in *Hooven & Allison.*

effectively departed from established doctrine and upholds the challenged taxes. It does so on the basis of a theory which is as elusive to logic as it is opposed to authority—a theory which is not only unsupported by economic fact or reason and without basis in any of the invoked "realities," but which turns *Brown* v. *Maryland* and its progeny into *ad hoc* results unrelated to their rationale, and disregards the harmonious reasoning on which these decisions were based and the process of one hundred and thirty-two years of constitutional adjudication.

The Court finds support for its decision in the language of *Hooven & Allison*. "Unlike *Hooven,*" we are told, "these are not cases of the mere storage in a warehouse of imported materials intended for eventual use in manufacturing but not found to have been essential to current operational needs." On the assumption that the cases before us present a situation not governed by prior adjudication, it is maintained that, since the goods in question had been "irrevocably committed . . . to 'use in manufacturing' at the plant and point of final destination," and were being used to supply the daily manufacturing needs of the plant, petitioners must be deemed to have *"so acted upon the imported materials* as to cause them to lose their distinctive character as 'imports.' "  But is not this merely a way of giving an asserted conclusion of law the appearance of a fact?  The vital question is how, if not when, do "imported materials . . . lose their distinctive character as 'imports.' "  After all, the vast bulk of imports are brought in for commercial purposes—to be exposed for sale in their original form or to be used as raw materials in manufacture. They are, that is, "irrevocably committed" to be sold or to be used in manufacturing. They are not, normally, brought in to be dumped into the sea, as was the tea at the Boston Tea Party. Of course the goods here had been imported and stored for

a manufacturing purpose. The manufacturer did not import them to sit idly in his storage area.

The very ground now relied upon by the Court, in its affirmance of the challenged taxes, was rejected in *Hooven & Allison,* as the record in that case overwhelmingly demonstrates.[13] One is bound to say that the passage

---

[13] At the hearing before the Ohio Board of Tax Appeals, the general manager of the Hooven & Allison Company was asked if the imported hemp was kept in the warehouse for any definite length of time. He answered:

"No; it might be we would need the stuff as soon as it got there and again we might not; it comes from long distances and we do not carry any more inventory than we need to; it takes three to six months for it to get to us; we attempt to keep a backlog for that; we attempt to run our business with a minimum working inventory, of course." Transcript of Record, p. 42, *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652.

Relying in large part on this testimony the Supreme Court of Ohio concluded that the goods "had so come to rest as to be mingled with the mass of property in this country . . . ." *Hooven & Allison Co.* v. *Evatt,* 142 Ohio St. 235, 242, 51 N. E. 2d 723, 726. In its brief before this Court, Ohio supported the validity of the tax on the basis of the above industrial circumstances:

"The evidence in the instant case shows that the petitioner purchased fibers solely for its own use, never for sale. It was impracticable to buy fibers a bale at a time to meet the immediate needs of its mill. It took from three to six months to get delivery after an order was placed. The undisputed testimony shows that the petitioner did not carry any more inventory than was actually needed, but due to the uncertainty of deliveries, it attempted 'to keep a backlog for that.' It attempted to operate 'with a minimum working inventory' (R. 16). In other words, when the imported goods reached the plant they were immediately used, in that they were essential to the continuous daily operation of petitioner's plant." Brief for Respondent, p. 20, *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652.

This Court's decision did not accept the arguments made by the State throughout the course of litigation. The theory thus rejected now serves as the basis for this decision.

568

quoted by the Court from Mr. Chief Justice Stone's opinion in support of the statement that the cases before us are "unlike *Hooven & Allison*," does not support that proposition.[14]

---

[14] In support of its argument that the cases before us are "unlike" *Hooven & Allison,* the Court quotes from the following passage from that case:

"It cannot be said that the fibers were subjected to manufacture when they were placed in petitioner's *warehouse* in their original packages. And it is unnecessary to decide whether, for purposes of the constitutional immunity, the presence of some fibers in the *factory* was so essential to current manufacturing requirements that they could be said to have entered the process of manufacture, and hence were already put to the use for which they were imported, before they were removed from the original packages. Even though the inventory of raw material required to be kept on hand to meet the current operational needs of a manufacturing business could be thought to have then entered the manufacturing process, the decision of the Ohio Supreme Court did not rest on that ground, and the record affords no basis for saying that any part of petitioner's fibers, stored in its warehouse, were required to meet such immediate current needs. Hence we have no occasion to consider that question." (Italics added.) 324 U. S., at 667.

The record in the case, the opinions below, and the briefs in this Court, leave no doubt that this passage does not refer to the bulk of the imported hemp stored in the warehouse of the Hooven & Allison Company as a "minimum working inventory." Indeed, such reference would be wholly inconsistent with the principles on which the opinion rests. Due regard for the record and for the opinions clarifies the Chief Justice's meaning. When the imported hemp was ready for use it was moved from the warehouse to the factory. At the hearing, the general manager testified as to this hemp:

". . . it is removed from the raw material account and charged into processing in the mill; each bale of fiber as it is removed from the raw material warehouse becomes, according to our records, in process. Of course we have to batch and treat this stuff; it may not be used for a couple of days; but as soon as it leaves the warehouse it is charged in process; . . . ." Transcript of Record, p. 43, *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652.

The Ohio Supreme Court took special note of this hemp which was

Putting thus to one side the unwarranted reliance on language in *Hooven & Allison,* let us examine the basis on which the state taxes are upheld. Both the imported veneers in *City of Algoma* and the ore in *Youngstown,* the Court holds, must be said to have been "put to the use for which they were imported," to have "entered the manufacturing process" and therefore to have lost their constitutional immunity, since they were "not only needed, imported and irrevocably committed to supply, but were actually being used to supply, the daily requirements of the plant." Again one must ask whether these phrases mean any more than that the goods were being held by the manufacturer for the purpose for which he had imported them—use in manufacture. They had not been processed, changed from their original form or shape, acted upon, physically altered in the slightest, mingled with domestic goods, or "used," in the sense that anything

---

in transit from the warehouse to the processing line. It remarked that:

"While the bales remain in the raw-material warehouse, they are carried in a raw-material account on appellant's books; but upon their removal from such warehouse the bales are immediately charged to goods-in-process account whether the bales have been broken or not." *Hooven & Allison Co.* v. *Evatt,* 142 Ohio St. 235, 237, 51 N. E. 2d 723, 724.

As far as appears, these bales of hemp which had been removed to the factory as immediately necessary for current needs, but which remained in their original packages, were not separately assessed for taxation, nor were they, at any stage of the proceedings, treated as a separate item. It is obvious, though his language is somewhat cloudy, that what Chief Justice Stone meant was that he was not considering whether the removed hemp had a special status. Therefore, although it could not "be said that the fibers were subjected to manufacture when they were placed in petitioner's *warehouse* . . ." it was "unnecessary to decide whether, for purposes of the constitutional immunity, the presence of some fibers in the *factory* was so essential to current manufacturing requirements that they could be said to have entered the process of manufacture." (Italics added.)

was done to them. They simply lay in storage areas awaiting use. To say that the goods "were actually being used to supply, the daily requirements of the plant," simply affirms the obvious fact that the imports, unaffected in the form in which they were brought in from abroad and deposited, awaited their intended, but not begun, manufacturing process. In all prior considerations of the Import-Export Clause the immunity of imported goods has been terminated only by physical handling or alteration, not by reference to their assumed prospective role in the importer's use of them. The imported hemp in *Hooven & Allison* was similarly "needed." It too was "irrevocably committed to supply," and clearly it was "actually being used to supply the daily requirements of the plant." To that end the hemp was imported. If the hemp was not to be so used it would not have been imported.

Furthermore, if we simply substitute "place of sale," for "plant" in the Court's reasoning—and we are not vouchsafed reasons either in abstract reasoning or in practical logic to disallow it—the identical enumeration of factors here thought sufficient to subject the imports to tax is found to be present in virtually every case in which this Court has invalidated a state tax on imports. The crates of champagne in *Low* v. *Austin,* and the bags of nitrate in *Anglo-Chilean Corp.* were also "needed, imported and irrevocably committed to supply," and "were actually being used to supply, the daily requirements" of the place of sale. In effect, the result of today's decision means that if imported goods are needed, they are taxable. If useless, they retain their constitutional immunity.

A close examination of the *Youngstown* case makes apparent this effective reversal of all previous judicial decision on the Import Clause, and justifies concern over today's holding. The stipulation of facts merely provides that the ore had been imported for purposes of manufac-

ture and that "at least" three months' supply was generally kept on hand. (R. 35.) There were no stipulations, nor were there any findings, as to the rate of use of the ore, the immediacy of the need for it, or its relation to the requirements of the plant, which also used domestic ore in its manufacturing. We have simply the fact that an inventory of ore was kept for eventual use. The tax was sustained by the Ohio Supreme Court on the ground that the bulk ore had become mingled with the general property of the State because new ore had been added to the pile, and old ore removed.[15] The Ohio court did not discuss or rest on the fact that the goods were "so essential to current manufacturing requirements that they must be said to have entered the process of manufacture." There is no possible way to make the Court's reasoning fit with the circumstances which underlie and define *Brown* v. *Maryland* or *Hooven & Allison*. Nothing has been done to the ore; it is in its original form and shape prior to use. Even as a matter of sound accounting, were that relevant, the goods could not be said to have entered the process of manufacture. We cannot assume or fictionalize facts. They must be found to exist. By assuming them, the Court strips them of relevance and impliedly rejects the unbroken meaning that the decisions have given the Import Clause.

Nor is the Court's conclusion strengthened by the suggestion that, since petitioner did not contest the taxability of that ore which had been removed to stock bins or houses, we must allow the rest of the ore to be taxed, as to distinguish between the two would be incongruous.

---

[15] Since the Court does not rely on the reasoning of the Ohio court, I will not stop to examine closely its ground of decision. It is sufficient to note that it is difficult to understand by what mutation an import loses its status as an import merely by mingling it with identical imported goods which are similarly being stored prior to use.

The question of the taxability of the removed ore is not before us. That question was not involved in any previous proceeding in this case. We have not the basis for knowledge as to what, if any, processing the ore underwent when removed to the stock bins. There is certainly no basis for assigning a hypothetical constitutional position to the removed ore, and using such an argumentative figment as the means for upholding the tax on the ore about which we do have the precise facts and whose immunity is the question before us.

In *United States Plywood* v. *City of Algoma,* one-half of the value of the imported wood was assessed for taxation. That amount was found to be necessary in order to meet "current operational needs," (R. 31) and was thus thought to be subject to state taxation. Formulas for the determination of current operational needs were discussed in detail by the Wisconsin courts, but the Court's opinion in *Youngstown* makes it unnecessary to examine those formulas here.[16] For the reasoning of *Youngstown* makes it clear that not merely half, but all of the imported veneers can be properly taxed by Wisconsin, since they were all "not only needed, imported, and irrevocably committed to supply, but were actually

---

[16] The Wisconsin court found that one-half of the imported goods was necessary to meet "current operational needs." On the basis of this finding of "fact," this Court finds its new interpretation of the Import Clause satisfied. Since that interpretation is far broader than the narrow concept of "current operational need," as applied by the Wisconsin court, it is unnecessary to discuss the constitutional validity of a rule based on "current operational need." It is sufficient to note here that such a formula possesses no basis in economics; it is merely an arbitrary figure assigned to a portion of inventory. An appropriate analysis of the formulas tentatively offered by the Wisconsin Circuit Court to support its finding would reveal the unreal and arbitrary nature of the finding. However such discussion would be superfluous here.

being used to supply, the daily manufacturing requirements of the plant." I can only reiterate that the fact that goods were "actually" to be used for the purpose for which imported is not, and has never been thought to be, relevant in determining their taxability under the Import Clause. The abstract assignment of a status to goods which are to be used in manufacture is certainly not germane to an evaluation of that physical transformation of the goods which has hitherto been required before an import could become vulnerable to state taxes. To say that goods are necessary to meet requirements merely asserts a truism which is equally applicable in every case this Court has decided under the Import Clause.

The Court summarizes its conclusion by stating that the imported goods "stood in the same relation to the State as like piles of domestic materials at the same place that were kept for use and used in the same way . . . ." [17] The Court then continues:

"In those circumstances, the tax was not on 'imports,' nor was it a tax on the materials because they had been imported, but because at the time of the assessment they were being used, in every practical sense, for the purposes for which they had been imported. They were therefore subject to taxation just like domestic property that was kept at the same place in the same way for the same use. We cannot impute to the Framers of the Constitution a purpose to make such a discrimination in favor of materials imported from other countries as would result if we approved the views pressed upon us by the manufacturers."

[17] This merely states a legal conclusion. The physical status of the imports did not differ in the slightest from that of any other import this Court has held to be immune from state taxation. Their "relation" to the State is the question for decision.

This is exactly the argument offered by the Supreme Court of California in support of the tax involved in *Low* v. *Austin*. That argument was then rejected unanimously by this Court and has never thereafter won acceptance. Whether the imposition of a tax resulted in "a discrimination in favor of materials imported from other countries" has never been thought relevant to the determination of its constitutional validity. The taxes which the Court struck down in *Low* v. *Austin*, in *Anglo-Chilean Corp.* and in *Hooven & Allison* were non-discriminatory taxes which fell equally on imported and domestic goods similarly situated. The Framers of the Constitution provided an absolute immunity for imports. The decisions of this Court have given to the brief phrases of Art. I, § 10, cl. 2, the content of a command: "a state shall not tax imports," not, "a state shall not tax imports discriminatorily." It is one hundred and thirty-two years too late to refuse to attribute to the Framers the purpose of freeing imports from state taxation which this Court has consistently assumed.[18]

Moreover, it cannot properly be said that the application here of the settled principles of the Import Clause results in "discrimination" in favor of foreign goods. Whether foreign goods are receiving a tax advantage over similar domestic goods can only be determined by an evaluation of the full range of imposts and duties which the importer has been required to pay to the National Government. Only then can we know, as a matter of economic reality, whether, in fact, there is discrimination. And if we find discrimination, it is the result of the decision of the Congress and the President that the goods involved should, as a matter of national policy, receive

---

[18] See the passage quoted at note 5, *supra*, from *Richfield Oil Corp.* v. *State Board of Equalization*, 329 U. S. 69, 75–76. See also Federalist No. 32 (Lodge ed. 1908) 186–188 (Hamilton).

preferential treatment. Certainly this Court should be reluctant to make inroads on a rule of law so well and lucidly settled that it may legitimately be regarded as an ingredient in the formulation which is made by the National Government when it determines, as a considered national policy, the extent to which import duties should be imposed.

Reluctant as one is to say so, it must be said that the Court proposes no reason for its decision which has not heretofore been rejected by this Court. Nor are we pointed to new compelling policies which must be invoked in order to upset a firmly established principle of our constitutional law; a principle which, perhaps more clearly than any other constitutional standard, has arrived at a lucid, coherent, and eminently workable distribution of power between the Nation and the States.

In the *Youngstown* case appellant also claims that the tax on a portion of its domestic ores was imposed in violation of the Equal Protection Clause of the Fourteenth Amendment. I concur in the Court's rejection of that claim.