No. 20,558.

THE CITY AND COUNTY OF DENVER, ET AL., *v.*
THE DENVER PUBLISHING CO.
(387 P. [2d] 48)

Decided December 2, 1963.    Rehearing denied December 16, 1963.

Mr. ROBERT S. WHAM, City Attorney, Mr. W. KEITH PETERSON, Assistant, for plaintiffs in error.

Messrs. GORSUCH, KIRGIS, CAMPBELL, WALKER and GROVER, Mr. DWIGHT D. MURPHEY, for defendant in error.

*En Banc.*

MR. JUSTICE PRINGLE delivered the opinion of the Court.

WE will refer to the plaintiffs in error collectively as Denver and to the defendant in error Denver Publishing Company as taxpayer. Denver brings writ of error to review a judgment entered upon motions for summary judgment filed by both parties whereby the trial court reversed in part and affirmed in part an order of the Board of Equalization of the City and County of Denver. That board had upheld the validity of assessment of ad valorem taxes levied by Denver on all newsprint imported by the taxpayer from Canada and held for storage in the warehouses and publishing plant of the taxpayer in Denver.

The taxpayer publishes a daily newspaper in Denver known as "The Rocky Mountain News." It is a subsidiary of Scripps-Howard. Nearly all of the newsprint which it purchases for use in the publication of its newspaper is imported from Canada. Title to the imported newsprint vests in the taxpayer as soon as the

railroad cars in which it is transported begin their journey to the United States. It takes approximately six days for the newsprint to reach Denver from Canada.

The taxpayer keeps an average inventory stored in its warehouses and publishing plant in Denver in an amount equal to 35 days supply. This amount is kept on hand to guard against "Acts of God, strikes, wrecks, fires, and other unpreventable and unpredictable accidents." The average daily consumption of newsprint is approximately 60 tons. The average annual amount of newsprint inventory stored in the taxpayer's publishing plant is approximately 30% of the total inventory or about 600 tons. Of the remainder, about 45% or 900 tons is stored in a warehouse owned by the taxpayer, about 25% or 500 tons is stored in a rented warehouse, and approximately 1% or 20 tons is kept at the Hirschfeld Press, which company publishes the taxpayer's Sunday television supplement.

The rolls of newsprint in the warehouses are maintained in their original wrappings. They are transferred in their original wrappings to the publishing plant and as rolls are needed they are taken from the store on hand according to the size needed at the time, stripped of their original wrappings and inspected by a crew of paper handlers and ultimately by the foreman in charge of the reel room prior to being placed on the press. If the rolls are of perfect shape or nearly so, they are run on a fast press which is the normal speed used in printing the newspaper. If they have become somewhat flattened in transit, they are set aside and at a later time when enough "out of round" rolls have been accumulated they are run through a second press at a slow speed. The taxpayer employs a full time accountant whose exclusive job is to account for the newsprint and to maintain records as to the newsprint held in storage. The policy of first in, first out, is pursued so that the oldest rolls are used first.

Prior to 1961 Denver did not assess such newsprint,

but following the decision of the United States Supreme Court in *Youngstown Sheet & Tube Co. v. Bowers,* (1959) 358 U.S. 534, 3 L.Ed. (2d) 490, 79 S. Ct. 383, Denver altered its policy and assessed a general ad valorem tax on all the newsprint stored by the taxpayer in Denver. The levy was based on the average funds invested by the taxpayer in newsprint during the year 1960.

The taxpayer paid $6,131.15 under protest, contending that Article I, Sec. 10, cl. 2, of the United States Constitution, which forbids a state to tax imports or exports without the consent of Congress, invalidated the assessment. The taxpayer followed proper procedures in seeking review before the Board of Equalization where its protest was rejected. Thereupon the taxpayer brought an action in the district court seeking a refund of the tax paid on the newsprint and an injunction against future assessments on the newsprint stored in Denver.

The trial court entered judgment for the taxpayer in the amount of $4,996.89 and for Denver in the amount of $1,134.26, which latter figure represented the tax on what the court found to be the part of the taxpayer's newsprint inventory imported from Canada which was properly taxed, plus the tax on the small amount of newsprint obtained from domestic sources. The court also issued a permanent injunction restraining Denver " * * * from imposing an ad valorem personal property tax on plaintiff's supply of foreign newsprint over and above the plaintiff's current operating requirements." From the judgment Denver brings error, contending that the entire amount of newsprint stored in Denver is subject to ad valorem tax, and the taxpayer brings cross error, contending that none of the newsprint inventory stored in Denver is subject to an ad valorem tax.

Denver's theory of the case is that *Youngstown,* supra, dictates that the entire 35-day supply of newsprint inventory must be considered as irrevocably committed to the printing process and as such necessary to meet

the taxpayer's "current operating needs" and that, therefore, the total inventory, rather than only a part thereof, has lost its immunity as an import.

We cannot agree that the rationale of *Youngstown* generates the effect ascribed to it by Denver. That decision cannot be viewed as creating an isolated principle, but must of necessity be connected with the particular factual situations which underlie it and, fundamentally, it must be placed in historical perspective.

Article I, Sec. 10, cl. 2, of the United States Constitution provides: "No state shall, without the consent of congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws; * * * "

While at first blush it might seem that a general property tax is not included within the interdiction against "imposts" or "duties" upon imports, we are precluded from such speculation by *Low v. Austin*, 13 Wall 29, 20 L.Ed. 517, which squarely held that a general property tax upon imports is forbidden by Article I, Sec. 10, cl. 2, of the Constitution. Since a general property tax, therefore, cannot be placed upon imports, the only question left for consideration is the determination of the time when an imported object becomes so intermingled with the mass of property in the state as to lose its character as an import and become subject to state property tax.

In any historical analysis of the decisions relating to this problem, we must begin with the opinion of Chief Justice Marshall in *Brown v. Maryland*, 12 Wheat. 419, 6. L.Ed. 678, the landmark case dealing with Article I, Sec. 10, cl. 2, of the United States Constitution. *Brown* was concerned with a Maryland statute declaring that importers of foreign goods by the bale or package must secure a license in order to sell their goods. The Court held that the statute levied a prohibited impost on imports and was, therefore, unconstitutional and in the course of the opinion Chief Justice Marshall stated that

" * * * there must be a point of time when the prohibition ceases, and the power of the state to tax commences." Having stated the premise, he elaborated on the vexatious nature of it:

"The constitutional prohibition on the states to lay a duty on imports — a prohibition which a vast majority of them must feel an interest in preserving — may certainly come in conflict with their acknowledged power to tax persons and property within their territory. The power, and the restriction on it, though quite distinguishable when they do not approach each other, may yet, like the intervening colors between white and black, approach so nearly as to perplex the understanding, as colors perplex the vision in marking the distinction between them. Yet the distinction exists, and must be marked as the cases arise. Till they do arise, it might be premature to state any rule as being universal in its application. *It is sufficient for the present to say, generally, that when the importer has so acted upon the thing imported that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the state; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the constitution.*" (Emphasis supplied.) 12 Wheat. 419, 439, 6 L.Ed. 678, 686.

While Chief Justice Marshall recognized a "taxable moment," he enunciated a negative principle; namely, that the states could not constitutionally tax imported goods while they remained in their original packages prior to sale. Marshall's discourse went beyond the scope of the question actually presented in *Brown,* but the Court subsequently applied the principle that imported goods themselves cannot be taxed by the states while held in the importer's warehouse in the original package

for resale. *Low v. Austin,* supra. The Chief Justice theorized that after imported goods were either sold, shorn of their original packages, or *put to use,* they became part of the common mass of property within the state and, hence, lost their constitutional immunity. Subsequent decisions sustained this reasoning; thus, in *Waring v. City of Mobile,* 8 Wall 110, 19 L.Ed. 342, goods in their original packages were held subject to tax after they were sold and in *F. May & Co. v. City of New Orleans,* 178 U.S. 496, 44 L.Ed. 1165, 20 S. Ct. 976, a tax was sustained on imported goods before they were sold when they were removed from their original packages. Furthermore, imports for manufacture lost their constitutional immunity from state taxation when they were subjected to the manufacture for which they were imported. *Gulf Fisheries Co. v. MacInerney,* 276 U.S. 124, 72 L.Ed. 495, 48 S. Ct. 227.

*Hooven & Allison Co. v. Evatt,* 324 U.S. 652, 89 L.Ed. 1252, 65 S. Ct. 870, (Commented on by Thomas Reed Powell in 58 Harv. L. Rev. 858) presented a situation where an Ohio ad valorem tax was levied on imported bales of hemp and other fibers which were stored in the manufacturer's warehouse in their original packages preliminary to their use in the manufacture of cordage and similar products. The Ohio Supreme Court had held the tax valid on the ground that imports for use, as opposed to imports for sale, lost their constitutional immunity upon storage in their original packages because they had become intermingled with the common mass of property within the state, 142 Ohio St. 235, 51 N.E. (2d) 723. The United States Supreme Court, through Chief Justice Stone, held that the tax violated the Import-Export Clause. The Court pointed out that there is no reason to say that goods imported for manufacture lose their character as imports any sooner or more readily than goods imported for resale. The Court directed attention to the three situations which Marshall declared caused the goods to lose their character as

imports, namely (1) breaking of the original package, (2) the resale, or (3) the putting of the article to the use for which it was imported, and then proceeded to hold that the mere storage of the hemp anticipatory to its being placed in the manufacturing process did not in itself constitute a "putting to use" and therefore held the tax upon the hemp invalid. But the *Hooven* Court specifically stated that it left open the question as to whether the presence of some fibers in the factory were so essential to "current manufacturing requirements" that they could be said to have entered the process of manufacture and hence had already been "put to the use" for which they were imported. This is squarely the problem with which we are faced today and with which the Supreme Court of the United States was faced in *Youngstown*. Before we proceed to analyze *Youngstown,* however, it is important to note that Mr. Justice Black based his dissent in *Hooven* on the ground that in his opinion the phrase "put to use" as used by Chief Justice Marshall in *Brown* was synonomous with the phrase "held for use" and by that reasoning he would hold as constitutionally valid a property tax on goods imported for manufacture and stored in warehouses of the manufacturer-importer. This view, however, was rejected by the *Hooven* majority.

Youngstown was a consolidation of two cases, *Youngstown Sheet & Tube Co. v. Bowers,* 166 Ohio St. 122, 140 N.E. (2d) 313, and *United States Plywood Corp. v. City of Algoma,* 2 Wis. (2d) 567, 87 N.W. (2d) 481. In the latter case, the Wisconsin Court had upheld a tax on lumber and veneers imported by the taxpayer. The imported veneers were stored in the taxpayer's warehouse in their original shipping wrappers prior to use in manufacturing. The imported lumber was placed in a storage yard in such a manner as to facilitate air-drying. This process did not remove enough moisture, so the lumber was also kiln-dried prior to being made into finished wood products. The Supreme Court of Wiscon-

sin had little difficulty in deciding that the imported lumber had entered the process of manufacture and had, therefore, been put to the use for which it was imported. The more perplexing question was whether the veneers had lost their constitutional immunity. In holding the veneers subject to tax, the court seized upon the fact that the trial court found that one-half of the imported veneers were required to be kept on hand to meet "current operational needs." This was the fact that placed the case within the category expressly left undecided in *Hooven & Allison Co. v. Evatt,* supra, and it was this finding that half of the veneers were required for the "current operational needs" of the manufacturer which led the Wisconsin court to determine that the items had been "put to use" within the test laid down by Chief Justice Marshall in *Brown v. Maryland,* supra.

In *Youngstown,* the Board of Tax Appeals of Ohio had upheld the taxpayer's argument that imported ore was immune from taxation when stored in piles preliminary to use by the taxpayer in its furnaces. The *stipulated facts* disclosed that the taxpayer maintained a supply of ore in *common piles sufficient to meet its estimated requirements for at least three months.* On these *stipulated facts* the Supreme Court of Ohio held that the ore lost its immunity.

It was on this state of the record that the Supreme Court of the United States acted in sustaining the taxes imposed by Ohio and Wisconsin. The importance of the findings of fact in *United States Plywood* and the stipulated facts in *Youngstown* were given explicit recognition by the United States Supreme Court in affirming the decisions:

"Unlike Hooven, *these are not cases of the mere storage in a warehouse of imported materials intended for eventual use in manufacturing but not found to have been essential to current operational needs. Here the Ohio and Wisconsin courts have in effect held that the stipulated and found facts show that the imported*

*materials that were taxed by those States were so essential to current manufacturing requirements that they must be said to have entered the process of manufacture,* and those courts have rested their judgments, in major part at least, on that ground. Our question therefore is precisely the one which the Court did not reach or consider in the Hooven Case." (Emphasis supplied.) 358 U.S. 534, 3 L.Ed. (2d) 490, 498, 79 S. Ct. 383.

The question before the United States Supreme Court, then, was whether imported goods required to be kept on hand to meet "current operational needs" lose their constitutional immunity. The Court concluded that in the light of applicable legal principles the immunity had ended with respect to the items taxed in *Youngstown* and *U. S. Plywood,* supra. Viewed in this context, it is clear that *Youngstown* does not stand for the proposition that foreign goods stored for eventual use in manufacturing are automatically to be equated with goods required to be kept on hand to meet "current operational needs." The rationale is, rather, that so much of stored imports as are required to be kept on hand to meet "current operational needs" are to be regarded as put to the use for which they were imported. Under the criteria laid down by *Brown* such goods lose their character as imports and are, therefore, subject to taxation by the states.

The essential ingredient in applying *Youngstown* is a determination of "current operational needs." It is the important first step without which the ultimate legal principle cannot be utilized. It is important to note here that in *Youngstown* the court did not accept the argument of Mr. Justice Black in his *Hooven* dissent that imported goods lose their immunity as imports when "held for use" by the importer-manufacturer. The Court specifically pointed out that *Youngstown* was not intended to overrule *Hooven,* but rather was in accord with it.

There is no rigid and inflexible rule which can be

laid down to determine the "current operational needs" of a taxpayer. This is an area wherein the policy of the law dictates *ad hoc* determinations based on the facts presented in each particular case. The trial court in the instant case held that since it took six days for the taxpayer to replenish its supply of newsprint from Canada and since the taxpayer used 60 tons of newsprint per day, the amount necessary for "current operational needs" was 360 tons and that this amount was taxable even though all the newsprint remained in its original package until actually being made ready for the presses. We approve the formula in the instant case and cannot conclude that as a matter of law the court made an erroneous determination of the "current operational needs" of the taxpayer.

The taxpayer contends that none of the newsprint was taxable, but as we have demonstrated, that portion necessary for "current operational needs" is not within the protection of Article I, Sec. 10, cl. 2, of the United States Constitution.

Denver's contention that since a 35-day supply was kept in storage by the taxpayer the entire 35-day supply must be taxable as a matter of law is also rejected. Such a contention fails to recognize the distinction between "current operational needs" and good business practices dictated by prudent management. The result is that the money judgment of $4,996.89 in favor of the taxpayer as a refund must be and is affirmed.

We note that the district court entered judgment in favor of Denver for the amount of the tax on the newsprint which was properly assessed. Denver did not seek a money judgment against the taxpayer; it merely resisted the taxpayer's action to recover all of the taxes levied on the inventory of newsprint which it had paid under protest. The amount of the judgment for the taxpayer left Denver in possession of that portion of the tax properly collected and required no judgment for Denver.

■ Denver also attacks the injunction entered by the court which restrains the city from imposing an ad valorem tax on taxpayer's supply of foreign newsprint over and above taxpayer's "current operating requirements." We agree with Denver with regard to this assignment of error.

The general rule is that each tax year is to be treated as a separate entity with the amount of tax resting on the value of the property as it exists in that year. Adequate legal remedies are available to this taxpayer if again subjected to an improper assessment. We do not feel that Denver should be subjected to contempt proceedings for error in judgment covering the "current operating requirements" of the taxpayer as they vary from year to year.

That portion of the judgment awarding Denver $1,134.26 and that portion of the judgment granting an injunction to restrain Denver from imposing a property tax on the taxpayer's supply of newsprint over and above "current operating requirements" is reversed. In all other respects, the judgment is affirmed.

Mr. Justice Day not participating.