[Civ. No. 28858. Second Dist., Div. Two. Jan. 6, 1966.]

VIRTUE BROS., Plaintiff and Respondent, v. THE COUNTY OF LOS ANGELES et al., Defendants and Appellants.

[Civ. No. 28859. Second Dist., Div. Two. Jan. 6, 1966.]

BEMIS BROS. BAG COMPANY, Plaintiff and Appellant, v. THE COUNTY OF LOS ANGELES et al., Defendants and Respondents.

[Civ. No. 28860. Second Dist., Div. Two Jan. 6, 1966.]

CLAYTON MANUFACTURING COMPANY, Plaintiff and Appellant, v. THE COUNTY OF LOS ANGELES, Defendant and Appellant.

[Civ. No. 28861. Second Dist., Div. Two. Jan. 6, 1966.]

ANCHOR POST PRODUCTS, INC. OF CALIFORNIA, Plaintiff and Appellant, v. THE COUNTY OF LOS ANGELES et al., Defendants and Appellants.

(Consolidated Cases.)

Greenbaum, Baker & Ancel, Louis R. Baker and Gerald T. Manpearl for Plaintiffs and Appellants and Plaintiff and Respondent.

Harold W. Kennedy, County Counsel, A. R. Early and DeWitt W. Clinton, Deputy County Counsel, for Defendants and Appellants and Defendants and Respondents.

ROTH, P. J.—All plaintiffs are manufacturers. Virtue Bros. (Virtue), imported plywood from Finland; Clayton Manufacturing Company (Clayton), imported steel tubing from the British Isles; and Anchor Post Products, Inc. of California (Anchor), imported wire from Australia. Taxes were levied by the County of Los Angeles and the City of Los Angeles (defendants) upon the assessed valuation of full inventories of import materials in the possession of plaintiffs on the first Monday in March 1960, the taxing date.[1] Plaintiffs paid under protest and sued for a refund.

These cases present the constitutional question of when and the extent to which a local nondiscriminatory property tax may be levied upon materials imported for use by local manufacturers.

Article I, section 10, clause 2, of the United States Constitution provides: "No State shall . . . lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection laws: . . ."

Plaintiffs contend that only so much of the imported materials which are removed from their respective warehouses and specifically set aside for manufacture pursuant to a production schedule are taxable.

[1]Revenue and Taxation Code, section 405 provides: "Annually, the assessor shall assess all the taxable property in his county . . . to the persons owning it . . . at 12 o'clock meridian of the first Monday in March. . . ."

The trial court agreed, and judgment for a refund was entered respectively for each plaintiff in the appropriate amount.

Defendants predicate this appeal[2] on the construction given to the import clause (*supra*) in the recent case of *Youngstown Sheet & Tube Co.* v. *Bowers* (1959) 358 U.S. 534 [79 S.Ct. 383, 3 L.Ed.2d 490], which they argue, asserts that the state may tax imported materials when the manufacturer has so acted upon the materials imported with full awareness of the realities of his business as to put them to use in a practical way.

The question posed, has like a sleeping dog, been allowed to lie although there have been some abortive kicks in the past. *Youngstown*, however, succeeded in arousing more than a growl or bark. The resolution of the long dormant question has a deep bite.

Judicial construction of the constitutional clause originates with *Brown* v. *Maryland* (1827) 25 U.S. (12 Wheat.) 419 [6 L.Ed. 678].

We start at the source. Chief Justice Marshall, speaking for the court, stated that case as follows: "The cause depends entirely on the question, whether the legislature of a state can constitutionally require the importer of foreign articles to take out a license from the state, before he shall be permitted to sell a bale or package so imported." (*Id.* p. 436.)

The Chief Justice held the tax unconstitutional and set forth reasons which, as might be expected, have been quoted and relied on ever since: "There is no difference, in effect, between a power to prohibit the sale of an article and a power to prohibit its introduction into the country. . . . No goods would be imported if none could be sold. No object . . . can be accomplished by laying a duty on importation, which may not be accomplished . . . by laying a duty on the thing imported in the hands of the importer. It is obvious that the same power which imposes a light duty can impose a very heavy one, one which amounts to a prohibition. Questions of power do not depend on the degree to which it may be exercised." (*Id.* p. 439.)

Foreseeing the conflict between the inherent right of a state to tax and the constitutional inhibition to tax imports,

---

[2]Plaintiffs Clayton and Anchor appeal from the judgment dismissing their fourth and fifth cause of action. Bemis, a plaintiff below, also appeals. No appeal was taken from the judgment in favor of Bemis.

he indicated that there must be a line of demarcation, and said : ". . . Yet the distinction exists, and must be marked as the cases arise. Till they do arise, it might be premature to state any rule as being universal in its application. It is sufficient for the present to say, generally, that *when the importer has so acted upon the thing imported that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the state*; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the constitution." (Italics added.) (*Id.* pp. 441-442.)

California had an early brush with the doctrine of *Brown,* when in 1870 it levied a tax similar to the one in the case at bench, on champagne imported from France by commission merchants for purpose of sale. They paid duties and charges and thereafter stored the wine in their original case in their warehouse in San Francisco, where they remained for sale.

Citing *Brown,* Mr. Justice Field held at 13 Wall. p. 34: ". . . goods imported do not lose their character as imports, and become incorporated into the mass of property of the state, until they have passed from the· control of the importer or been broken up by him from their original cases. . . . The question is not as to the extent of the tax, or its equality with respect to taxes on other property, but as to the power of the state to levy any tax. . . ." (*Low* v. *Austin,* 80 U.S. (13 Wall.) 29 [20 L.Ed. 517].)

*Youngstown* does not permit the type of state tax here levied on materials imported for sale. *Youngstown* affirms that materials imported for sale are still immune. It makes clear that materials imported for manufacture lose their tax immunity when required for current operational needs and irrevocably committed to the use for which they have been imported. Mr.· Justice Frankfurter in a vigorous dissent, argues there is no distinction. He asserts that *Youngstown* overrules 132 years of unbroken law and that the reasoning of the majority opinion is applicable to imports for sale as it is to imports for manufacture.[3]

---

[3]Mr. Justice Frankfurter said in part: "For one hundred and thirty-two years . . . this Court has held, without a single deviation, that a State may not tax imports from foreign countries while retained by the importer in their original . . . form prior to the use of the goods or their

In *Youngstown* the facts were stipulated and showed the following operation: Ore was shipped from a foreign country. It was unloaded at the port of entry, thereupon reloaded and transported to Youngstown's place of business, unloaded, separated and placed in separate piles in separate areas of the ore yard. Daily manufacturing needs were taken from these piles, deposited into "stock bins" or "stock houses" holding one or two days' supply. As ore from a particular pile was consumed, other ore was brought in and unloaded on top of the remainder in the particular pile. This replenishment process was continuously repeated. All of the ore was taxed.[4]

In the cases at bench, the operation was substantially the same. In *Virtue,* tax was assessed against 67,895 pieces of

---

sale. Today the Court, . . . disregards this historic course of constitutional adjudication . . . . . . . And it does so, moreover, without overruling the decisions which the basis and logic of this new reading of the Constitution can no longer sustain. But they remain decisions of this Court. Thus, we are left with a confusing series of conflicting cases . . . This confusion is substituted for a principle so plain of application that the controversies in this Court over the meaning of this far-reaching constitutional provision have numbered less than a dozen in our entire history." (*Id.* pp. 552-553.)

He says further: "If the merchant who imported goods for the purpose of sale was entitled to realize that purpose before being subject to state taxes, certainly the manufacturer who had imported goods in order to process them was entitled to no lesser privilege. Goods lying in a manufacturer's warehouse in their original form . . . are no more a part of the general mass of property of a State than are goods which are displayed by a commission merchant, in their original crates, for purposes of sale; . . ." (*Id.* p. 563.)

Again he says: "A close examination of the Youngstown Case makes apparent this effective reversal of all previous judicial decision on the Import Clause . . . . The stipulation of facts merely provides that the ore had been imported for purposes of manufacture and that 'at least' three months' supply was generally kept on hand. . . . There were no . . . findings, as to the rate of use of the ore, the immediacy of the need for it, or its relation to the requirements of the plant, . . . We have simply the fact that an inventory of ore was kept for eventual use. . . ." (*Id.* p. 571.)

Again, speaking of the plywood case, he says: "Formulas for the determination of current operational needs were discussed in detail by the Wisconsin courts, but the Court's opinion in Youngstown makes it unnecessary to examine those formulas here. For the reasoning of Youngstown makes it clear that not merely half, but all of the imported veneers can be properly taxed by Wisconsin, since they were all 'not only needed, imported, and irrevocably committed to supply, but were actually being used to supply, the daily manufacturing requirements of the plant.' I can only reiterate that the fact that goods were 'actually' to be used for the purpose for which imported is not, and has never been thought to be, relevant in determining their taxability under the Import Clause." (*Id.* pp. 572-573.)

[4]*Youngstown* also included *United States Plywood Corporation* v. *City of Algoma.* United States Plywood Corporation imported green lum-

plywood imported from Finland and warehoused in its original strapping on Virtue premises adjacent to their manufacturing plant. Thereafter, it was removed to the processing area of the plant where it was manufactured into table tops. Annually, Virtue consumes about 145,200 pieces. A 90-day supply is 38,400 pieces, and a five-day supply is 2,750.

Plywood orders must be placed with the mills in Finland approximately five months in advance of required arrival, and shipping time is approximately seven weeks. Shipments arrive monthly. However, a two months' minimum inventory of 24,200 pieces is maintained to provide for delay due to force majeure.

In processing plywood, a production schedule, based on current sales activity, is sent to the production department weekly. This schedule controls the volume of plywood and other materials required for production at any given time. The production supervisor of the plant testified that the minimum inventory required for production purposes was a five-day supply based on the weekly schedule.

All the plywood assessed was eventually used.

Except for the type and origin of material, amount imported and consumed annually, amount if any, in reserve for force majeure reasons, the facts in *Clayton* and *Anchor* are substantially the same.

Ten years before *Youngstown*, in *Hooven & Allison Co.* v. *Evatt*, 324 U.S. 652 [65 S.Ct. 870, 89 L.Ed. 1252], the Supreme Court, in a case similar on the facts to *Youngstown*, rejected the argument that imports for use in manufacture stored in a warehouse on the premises of the manufacturer, were subject to state taxation, appearing to hold that actual use of the material was required to destroy the immunity. In *Hooven*, the Court said: ". . . [W]hen [the imported materials are] used for the purpose for which they are imported, they cease to be imports and their tax exemption is at an end." (*Id.* at p. 665.)

Comparing *Brown* and *Hooven*, the Court in *Youngstown* said at pages 541-542:

"While Chief Justice Marshall did not undertake definitively to state just what acts or conduct of the importer

---

ber in bulk and veneers. In *Youngstown*, all the ore was taxed. In *Plywood*, one-half of the lumber and veneers on hand on the taxing date was found to have been "necessarily required to be kept on hand to meet the current operating needs of petitioner's manufacturing plant, . . . ." (*Youngstown Sheet & Tube Co.* v. *Bowers, supra*, p. 547.)

would be deemed to have 'so acted upon the thing imported' as to cause it to be 'mixed up with the mass of property in the country [and to lose] its distinctive character as an import,' he did specify some of the acts that would so result. He held . . . [among other things] (3) that goods brought into this country by an importer 'for his own use' and here 'used' by him are to be regarded as a part of 'the common mass' of property and are not immune from state taxation.''

The court added at page 542:

''Thus, though *Brown* v. *Maryland* (U.S.) *supra,* holds that goods brought into the country by an importer 'for his own use' are not exempted from state taxation by the Import-Export Clause, and *Hooven & A. Co.* v. *Evatt* (U.S.) *supra,* holds that they are, both agree that when the imported goods are 'used for the purpose for which they are imported, they cease to be imports and their tax exemption is at an end.' *Hooven & A. Co.* v. *Evatt, supra* (324 U.S. at 665). Compare *Brown* v. *Maryland, supra* [ (U.S.) 12 Wheat.] at 441-443.''

Further distinguishing *Hooven,* the court said in *Youngstown* at page 544:

''. . . Here the Ohio and Wisconsin courts have *in effect* held that the stipulated and found facts show that the imported materials that were taxed by those States were so essential to current manufacturing requirements that they must be said to have entered the process of manufacture, and those courts have rested their judgments, in major part at least, on that ground. Our question therefore is precisely the one which the Court did not reach or consider in the Hooven Case.'' (Italics added.)

The court then proceeds to set forth those ''stipulated and found facts'' upon which taxability is based: ''The stipulation in the Youngstown case shows that the imported ores were essential to the operation of Youngstown's Ohio plant; that Youngstown had imported them 'for use in manufacturing' and 'to meet its estimated [manufacturing] requirements' at that plant; that the ores had arrived at their destination, had been placed in 'piles' in the 'ore yards' of that plant, and their importation journey definitely had ended; that the ores were irrevocably committed to 'use in manufacturing' at that plant and point of final destination; and that the daily ore needs of the plant were conveyed from the 'piles' in the 'ore yards' to 'stock bins' or 'stock

houses,' holding one or two days' supply, from which they were fed into the furnaces. *Does not the stipulation thus show* that the ores were not only needed, imported, and irrevocably committed to supply, but were actually being used to supply, the daily requirements of the plant? It seems to us that these stipulated facts inescapably establish that Youngstown had 'so acted upon the [imported ores]' (*Brown* v. *Maryland, supra* ((U.S.) 12 Wheat. at 441)), by using them 'for the purpose for which they [were] imported,' that they must be held 'to have then entered the manufacturing process' (*Hooven & A. Co.* v. *Evatt, supra* (324 U.S. at 665, 667)) and to have lost their distinctive character as 'imports' and all tax immunity as such.'' (*Id.* 358 U.S. at pp. 545-546; italics added.)

The Court stated and disposed of the question as follows: ''Do the facts . . . when considered in the light of applicable legal principles, show that these manufacturers *have so acted upon the imported materials* as to cause them to lose their distinctive character as 'imports' by irrevocably committing them, after their importation journeys have definitely ended, to 'use in manufacturing' at the plant and point of final destination, and by 'entering' and 'using' them 'in manufacturing' at that place? The manufacturers, relying upon their understanding of the Hooven case, argue that they do not, but we have concluded that they do.'' (*Id.* 358 U.S. at p. 543.)

The court at page 549 said further:

''The materials here in question were imported to supply, and were essential to supply, the manufacturer's current operating needs. When, after all phases of their importation had ended, they were put to that use and indiscriminate portions of the whole were actually being used to supply daily operating needs, they stood in the same relation to the State as like piles of domestic materials at the same place that were kept for use and used in the same way. The one was then as fully subject to taxation as the other. In those circumstances, the tax was not on 'imports,' nor was it a tax on the materials because they had been imported, but because at the time of the assessment they were being used, in every practical sense, for the purposes for which they had been imported. They were therefore subject to taxation just like domestic property that was kept at the same place in the same way for the same use. We cannot impute to the Framers

of the Constitution a purpose to make such a discrimination in favor of materials imported from other countries as would result if we approved the views pressed upon us by the manufacturers. Compare *May* v. *New Orleans* (178 U.S., at 509)."

Difficulties have been already encountered in the application of the *Youngstown* doctrine.

Since *Youngstown,* our attention has been called to two cases in which the *Youngstown* rule has been applied in a manner different from its application in the cases at bench.

In *The City & County of Denver* v. *Denver Publishing Co.,* 153 Colo. 539 [387 P.2d 48], the Supreme Court of Colorado rejected the contention that a full 35-day inventory of newsprint imported from Canada was taxable by the state. The test, stated the Court, was not whether the materials were "held for use", for that criterion was advanced by Justice Black in his dissent in the *Hooven* case and was not adopted by the majority in *Youngstown;*[5] rather, the crucial issue is whether the materials were required to be kept on hand to meet "current operational needs." As to this test, the court said: "There is no rigid and inflexible rule which can be laid down to determine the 'current operational needs' of a taxpayer. This is an area wherein the policy of the law dictates *ad hoc* determinations based on the facts presented in each particular case." (*Id.* at pp. 548-549.) The reviewing court then approved a formula devised by the trial court which held that since it took six days for the taxpayer to replenish its supply of newsprint from Canada, and since the taxpayer used 60 tons of newsprint per day, the amount necessary for "current operational needs" was 360 tons, which amount was taxable. The reviewing court said that it could not conclude that such a formula was, as a matter of law, erroneous.

In *Orr Felt & Blanket Co.* v. *Schneider,* 3 Ohio St. 2d 14 [209 N.E.2d 150], the Ohio Supreme Court came to the same conclusion, citing copiously from *Denver,* in determining the taxable status of grease wool imported from Australia and stored in the taxpayers' warehouse. The Ohio court adopted the formula approved in *Denver.* It said at page 156: "This is a realistic, practical and rational rule and the facts upon

---

[5]It is to be noted, however, that Justice Black concurred in the majority opinion in *Youngstown.* It is inferable that that opinion was in conformity with his views on this matter, and such an inference would substantiate the opinion that we reach *infra.*

which it is based are easily and accurately obtainable from the records of the taxpayer.

"If more of the imported goods are available than would be used before the time needed to secure a new supply would elapse this amount is excess and is not 'irrevocably committed to use in manufacturing'."

The attempts to limit the application of *Youngstown* to materials on hand which can be replenished within a scheduled shipping time (as in the Colorado and Ohio cases) or to materials set aside to meet a production schedule, (as in the cases at bench) seem to us to emasculate the doctrine of *Youngstown* and leave no practical rule.

In the cases at bench, the undisputed showing for each of the plaintiffs was that only a five-day supply of imported material was taken from the warehouse to meet the weekly production schedule of each of said plaintiffs and the trial judge held that only so much of the manufacturer's inventory was taxable, irrespective of the size of the inventory and the undisputed fact that the entire inventory of the manufacturer was imported for manufacturing purpose.

In this age of automation, no stretch of the imagination is needed to visualize a conveyor belt from warehouse to the machine in a manufacturing facility. The unbroken package of plywood, ore or wire, as the case may be, could be placed on the conveyor belt in the warehouse and so treated that before it reached the machine, it would, in the process of conveyance, be broken, its contents separated, and conditioned, and thus fed into the machine. If such were the operation, it would appear that all that could be taxed would be the materials carried in the conveyor at noon on the first Monday in March. Noon being generally the lunch hour, it is not improbable that in spite of a huge inventory, none of it would be in the conveyor at that time.

Further, it is not unusual for a manufacturing plant to close down for a few days or a week or longer period during a manufacturing year.

Assuming a proper good faith shutdown, what is to prevent a manufacturer from electing to close down for a period of time which includes the first Monday in March? In such an event, the formula applied by the trial court would be completely nullified.

We think too that the formula applied by the Colorado and Ohio courts is defective. If all that a manufacturer requires for current operational needs is an inventory which will be

expended just as the next regular shipment is unloaded at the manufacturer's plant, why is any inventory in excess of replenishment needs, so defined, ever maintained?

"Current operational needs" is a phrase predicated on the industrial facts of life, and must reflect the needs of a manufacturing business as an ongoing concern. It is doubtful whether the manufacturers of this state would, despite a decision upholding a tax on the full inventory in their plants, maintain a reduced inventory fitted in a Procrustean manner to meet the constitutional test so applied to them. Clearly, their operational needs require more.

Would not a manufacturer, for example, take advantage of price and shipping terms and overbuy in spite of knowledge of the tax? Such imported materials nevertheless have been committed for current operational needs within any fair industrial definition of that term since it is fair to assume that the manufacturer, even though temporarily overinventoried for reason of price, will at some future date adjust any real surplus. Since the constitutional immunity with respect to materials for sale has not been removed, if a manufacturer imports to take advantage of price only and expects to use only a portion of the purchase for current operational needs, nothing in *Youngstown* prevents a good faith sale of the imported materials to others. It is simple enough to segregate materials intended for sale. Thus, there would be no tax on materials not irrevocably committed to manufacture.

Moreover, no sound executive of any manufacturing concern would, in our opinion, consider that current operational needs were provided for, if, as a minimum, in addition to the inventory which can be replenished on a fixed shipping schedule, there were not adequate materials on hand to act as a complete hedge against deterioration, destruction, and loss caused by force majeure.

To us, it seems completely unrealistic to equate *ad hoc* testimony of a plant manager, a production or efficiency expert, as to replenishment time or the quantity of materials needed for a production schedule, however factual such testimony may be, with the test set forth in *Youngstown* that imported material is taxable when required for current operational needs or requirements and has been so acted upon that it is irrevocably committed to manufacture.

There is language in *Youngstown* which supports the judgment of the seasoned and able trial judge in the cases at bench, and which lends support to the conclusions of the

Colorado and Ohio courts. However, the facts before the court in *Youngstown* and the ultimate decision in the face of the Frankfurter arguments in dissent, indicate to us that the opinion speaks broadly of the state's power to tax. Much of the language in *Youngstown* which gives the complexion of validity to the formula adopted by the trial court, is used, in our opinion, to explain the consistency of *Youngstown* with past decisions of the Supreme Court.

The materials here in question had reached the end of their importation journey, and indiscriminate portions of the whole were actually being used to supply daily operating needs. The property tax upon them was nondiscriminatory; they were not singled out because they were imported, nor was the tax even remotely connected with the activity of importation. Had the materials been of domestic origin, they would have been fully taxable under the assessment now in dispute. By enforcing this tax, California is in no way taking undue advantage of its position as an importing state to the detriment of inland states. "We cannot impute to the Framers of the Constitution a purpose to make such a discrimination in favor of materials imported from other countries as would result if we approved the views pressed upon us by the manufacturers." (*Youngstown Sheet & Tube Co. v. Bowers, supra,* at page 550.)[6]

In our opinion, *Youngstown* requires that the full inventory in the possession of plaintiffs, committed to the purpose of manufacture, on the first Monday in March, is subject to tax. We so hold.

■ Anchor, Clayton and Bemis Bros. Bag Company, have also appealed from that portion of the judgment dismissing their fourth and fifth causes of action on the ground that they had failed to exhaust their administrative remedies. The gist of these causes of action is that the assessment against them was at a ratio of 50 percent of actual value, whereas the prevailing assessment ratio for *real* property was 20.4 percent. They complain of an overassessment. They allege they did not bring the issue first to the Board of Equalization because other taxpayers had brought identical cases before the board and in such identical cases the board stated its policy was to tax the type of property here involved at a 50 percent ratio. These manufacturers plead no valid excuse.

[6]See Crosskey, Politics and the Constitution in the History of the United States, pages 299-323 (1953, University of Chicago Press.)

The cases in this state requiring the exhaustion of administrative remedies where overvaluation is claimed, are legion. (See, e.g. *Dawson* v. *County of Los Angeles,* 15 Cal.2d 77, 81 [98 P.2d 495]; *Eastern-Columbia, Inc.* v. *County of Los Angeles,* 61 Cal.App.2d 735, 745 [143 P.2d 992]; *Marsh Wall Products, Inc.* v. *County of Los Angeles,* 193 Cal.App.2d 58, 61 [13 Cal.Rptr. 699]; *Lockheed Aircraft Corp.* v. *County of Los Angeles,* 207 Cal.App.2d 119, 130-131 [24 Cal.Rptr. 316].)

In *Star-Kist Foods, Inc.* v. *Quinn,* 54 Cal.2d 507, the court states at pages 509-510 [6 Cal.Rptr. 545, 354 P.2d 1]: ". . . Ordinarily a taxpayer seeking relief from an erroneous assessment must exhaust available administrative remedies before resorting to the courts. [Citations omitted.] Prior application to the local board of equalization has not been required, however, in certain cases where the facts were undisputed and the property assessed was tax-exempt [citations omitted], outside the jurisdiction [citations omitted], or nonexistent [citations omitted]." In the cases at bench the taxpayers plead none of these circumstances.

Moreover, the administrative denial of relief in other cases has been held to be no excuse for failure to first take advantage of available administrative remedies (*Abelleira* v. *District Court of Appeal,* 17 Cal.2d 280, 300-301 [109 P.2d 942, 132 A.L.R. 715]; *City of Los Angeles* v. *California Towel & Linen Supply Co.,* 217 Cal.App.2d 410, 419-420 [31 Cal.Rptr. 832].)

We note that the manufacturers here had gone to the Board of Equalization on the issue of the import clause. Why they did not raise the overassessment issue at that time, does not appear. We cannot assume, however, that if they had shown that a different assessment ratio was being applied to real and personal properties throughout the county, that the board would have upheld the tax against them.

For the reasons stated above, we hold that that portion of the judgment restricting the taxable property to a five-day supply must be reversed with directions to deny any refund to all of the taxpayers. Since the facts are either stipulated or admitted, the trial court is directed to vacate its findings in each case in which the tax in question is limited to a five-day supply of imported material and to make a finding that the tax as levied was proper, and further, to vacate that portion of the judgment granting a refund to plaintiffs and

enter judgment for defendants inclusive of their costs. That portion of the judgment dismissing the fourth and fifth cause of action of Anchor Post, Clayton Manufacturing Company and Bemis Brothers Bag Company, is affirmed.

Defendants are to recover costs.

Herndon, J., and Fleming, J., concurred.

The petition of the plaintiff and appellant in Civ. Nos. 28859, 28860 and 28861 and the plaintiff and respondent in Civ. No. 28858 for a hearing by the Supreme Court was denied March 2, 1966.