[Civ. No. 31121. Fourth Dist., Div. One. Jan. 29, 1985.]

COUNTY OF SAN DIEGO, Plaintiff and Respondent, v.
LAFAYETTE STEEL COMPANY, Defendant and Appellant.

COUNSEL

Seltzer, Caplan, Wilkins & McMahon and Joyce A. McCoy for Defendant and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Howard P. Brody, Chief Deputy County Counsel, and Bruce W. Beach, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

BUTLER, J.—Lafayette Steel Company, dba Ocean Systems Research Division (Lafayette) appeals a judgment following a court trial awarding the County of San Diego (County) $85,033.50 for unpaid taxes and penalties.

### I

The parties stipulated to the facts and at the trial entered into other stipulations. No testimony was taken and no evidence was received.

Lafayette, a Michigan corporation with an office in Sitka, Alaska, owned the documented vessel *Tradition,* which was registered at Sitka. When operative, the vessel engaged in commercial fishing.

The *Tradition* arrived in San Diego in November 1977. During the period January 1–January 30 and March 6–December 31, 1978, the *Tradition* was moored in San Diego harbor undergoing repairs. The vessel made one trip, San Diego to Costa Rica and back February 1–March 5, 1978. The vessel was not in San Diego on March 1, 1978, the 1978 lien date for unsecured property taxes. Lafayette sold the vessel in February 1979 for $1.35 million through an escrow established with Bank of America's main office in San Diego.

In May of 1980, Lafayette received from the County an unsecured property tax bill for $35,415 representing an "escape" assessment for 1978 on the vessel, showing its taxable value at $3 million and assessed value of $750,000. On May 5, 1980, Lafayette wrote the County the vessel had been sold in 1979 and asked the "1980 tax bill should be cancelled from our account."

On May 14, 1980, the County returned the tax bill to Lafayette pointing out: "Please note that the bill is an 'escaped assessment for 1978.' The referenced vessel was located in San Diego County and operated out of here for that year. Lafayette Steel was the owner of record for that year." On June 2, 1980, Lafayette responded and denied liability for California taxes, noting the vessel was registered in Alaska, was in San Diego for repairs and refurbishing and did not operate out of San Diego. Ping-pong-like, the

County returned the tax bill to Lafayette on June 10, saying: "Personal property such as a boat is assessed in the county where it is habitually moored when not in use. The home port is not a deciding factor in assessment. There are no provisions in the law for vessels here for repairs and refurbishment. The San Diego Unified Port District records indicate that the Tradition was habitually moored in San Diego County in 1978.

"Appeals on assessments may be made by obtaining an application and filing it with the Clerk of the Assessment Appeals Board, . . ." Lafayette did not appeal the assessment or pay the tax. On December 9, 1980, the County filed its complaint for recovery of unsecured delinquent taxes of $35,415 and for penalties of $2,124.90. Lafayette answered, denied liability for tax or penalty and asserted affirmative defenses limiting assessment to 1 percent of cash value, excessive valuation, lack of jurisdiction to levy tax and the County's failure to inform concerning remedies.

In late 1981, after the law suit was at issue, the County sent Lafayette a 1978 supplementary tax bill reflecting increased rates mandated by *Board of Supervisors* v. *Lonergan* (1980) 27 Cal.3d 855 [167 Cal.Rptr. 820, 616 P.2d 802], and showing $29,640 as additional taxes assessed against the *Tradition* for 1978. Lafayette applied for equalization of the 1978 supplementary assessment on December 30, 1981. The application asserted the full value of the *Tradition* was $1.35 million instead of $3 million as valued by the assessor. The application was denied by the assessment appeals board for lack of jurisdiction. The record does not disclose an amendment to the complaint to seek recovery of the supplementary tax of $29,640. The parties and the court dealt with the controversy as if the complaint had been so amended and neither party refers to the omission on this appeal.

## II

■ Lafayette contends the *Tradition* did not have a tax situs in San Diego and the County lacked jurisdiction to assess the taxes. It is true the vessel was registered in Sitka, Alaska, and the owner, Lafayette, was a foreign corporation not domiciled in San Diego. However, the taxable situs of a vessel is not determined by the designation by the owner of a home port. If the owner locates the vessel in a port other than that designated under conditions suggesting a permanent base, the situs of the domicile yields to the second port and the vessel is subject to the taxing power of another entity. (*Southern Pacific Co.* v. *Kentucky* ex rel. *Alexander* (1911) 222 U.S. 63, 67-68 [56 L.Ed. 96, 98, 32 S.Ct. 13]; *Sayles* v. *County of Los Angeles* (1943) 59 Cal.App.2d 295, 298 [138 P.2d 768].) The determination whether the *Tradition* is subject to County tax depends upon the existence of sufficient contacts between the County and the vessel to satisfy due process,

i.e., use and employment within the jurisdiction (*Sea-Land Service, Inc.* v. *County of Alameda* (1974) 12 Cal.3d 772 [117 Cal.Rptr. 448, 528 P.2d 56]) and the opportunities, benefits or protection afforded the vessel by the County (*Zantop Air Transport, Inc.* v. *County of San Bernardino* (1966) 246 Cal.App.2d 433, 437 [54 Cal.Rptr. 813]). Here, Lafayette did not pay 1978 tax on the vessel in any jurisdiction. The *Tradition* except for a one-month round trip voyage to Costa Rica was moored in San Diego harbor from November 1977 at least through December 31, 1979, and was sold through a San Diego bank escrow in February of 1979.

The vessel was used and employed in the County in the 1978 tax year and was entitled to the benefits and protection afforded vessels moored in the harbor. Substantial evidence supports the court's conclusion the *Tradition* was subject to the County's 1978 unsecured property tax.

### III

The court rejected Lafayette's Revenue and Taxation Code section 227[1] claim of *Tradition's* entitlement to be assessed at 1 percent of its full cash value as a documented vessel engaged exclusively in the taking and possession of fish for commercial purposes. The entitlement claim was denied by the court for Lafayette's failure to exhaust administrative remedies afforded by an appeal to the assessment appeals board.

The County concedes the *Tradition* was entitled to the 1 percent assessment rate had Lafayette timely claimed entitlement by any of the statutory procedures or appeal to the assessment appeals board; as Lafayette did neither, the *Tradition* is taxable at the full rate.

Lafayette correctly points out the times within which the claim for the 1 percent entitlement could be made had long since passed upon its receipt of the May 1980 escape assessment and the November 1981 supplementary tax bill.

Section 254 at relevant times then provided anyone claiming the documented vessel exemption under section 227 shall submit to the assessor annually an affidavit, giving any information required by the board of supervisors. The affidavit was required to be filed "between the lien date and 5:00 p.m. on April 1" (§ 255, subd. (c)). The "lien date" is the time when taxes for any fiscal year become a lien on property (§ 117). Unsecured personal property taxes are due as of 12:01 a.m. on the first day of March preceding the fiscal year for which the taxes are levied (§§ 2192, 2901).

---

[1]All statutory references are to the Revenue and Taxation Code unless otherwise specified. The assessment is now at the rate of 4 percent (Stats. 1980, ch. 1208, § 76, p. 4082).

Claims for entitlement to the 1 percent tax rate arising out of an escape assessment on a documented vessel do not fit in these procedural time frames. Property is deemed to have escaped assessment when its owner fails to file a property statement, showing all taxable property, with the assessor between the lien date and 5 p.m. on the last Friday in May and such failure results in no assessment or assessment at a lower value than would have been obtained had the property been properly reported (§§ 441, 442, 531). Property escaping assessment is assessed on the lien date for the year for which it escaped assessment (§ 531).

Here, Lafayette failed to file the property statement, the assessor located the vessel, made the escape assessment and the collector demanded the $35,415 payment by May 21, 1980. Lafayette could not have complied with the statutory time limits in claiming the 1 percent entitlement for documented vessels on the escape assessment.

However, as the county points out, Lafayette's administrative remedy was by way of an appeal to the assessment appeals board. "A reduction in an assessment on the local roll" can be made only upon the filing with the board of an application showing the facts to require the reduction and the applicant's opinion of the full value of the property (§ 1603, subd. (a)). Applications for reduction are filed within the time period July 2-September 15 (§ 1603, subd. (b)). Escape assessments, i.e., those made "outside the regular assessment period," are not effective for any purpose including review, equalization and adjustment by the board until the assessee has notice of the assessment (§ 1605, subd. (a)). An application for reduction of an escape assessment must be filed with the clerk of the board no later than 60 days after the date the assessee was given notice (§ 1605, subd. (b)).

■ The phrase "reduction in an assessment" necessarily contemplates not only a reduction in the value of the property sought to be taxed (*Stenocord Corp.* v. *City etc. of San Francisco* (1970) 2 Cal.3d 984, 988 [88 Cal.Rptr. 166, 471 P.2d 966]), but also a reduction in the rate applicable to the taxable property. (*Virtue Bros.* v. *County of Los Angeles* (1966) 239 Cal.App.2d 220, 231-232 [48 Cal.Rptr. 505].) Contrary to Lafayette's contention, section 1605 provides an administrative remedy for assertion of the 1 percent rate of tax entitlement for documented commercial fishing vessels under section 227 in escape assessment situations.

IV

■ Lafayette concedes it did not seek reduction in assessment by appealing to the assessment appeals board within 60 days or at any time following notice in May of 1980 of the escape assessment and levy of the

$35,415 tax. Lafayette argues the application for reduction in assessment filed within 60 days from notice of the supplementary tax bill for $29,640 given in November 1981 relates back to and includes the original May 1980 assessment and constitutes recourse to an administrative remedy with respect to the 1 percent entitlement claim.

Lafayette is wrong for two reasons. First, the 1981 supplementary tax bill did not constitute a reassessment of the property. As mandated by *Lonergan,* the county simply increased the rate of tax on unsecured property which here escaped assessment on the 1978 tax roll. The supplementary tax bill noted the original 1978 bill for $35,415 had not been paid.

Second, the request for equalization did not claim the section 227 1 percent entitlement for documented fishing vessels. Equalization was sought solely on the basis of valuation, Lafayette asserting the vessel's full cash value was $1.35 million as opposed to the assessor's valuation of $3 million.

V

The court correctly concluded Lafayette's failure to exhaust its available administrative remedy, an application for reduction in assessment claiming the 1 percent entitlement, barred its consideration at trial of the claimed entitlement (*Stenocord Corp.* v. *City etc. of San Francisco, supra,* 2 Cal.3d 984, 990; *Virtue Bros.* v. *County of Los Angeles, supra,* 239 Cal.App.2d 220, 232).

Judgment affirmed.

Brown (Gerald), P. J., and Staniforth, J., concurred.